## SAN CARLO OPERA CO. v. CONLEY.

District Court, S. D. New York.
Aug. 12, 1946.

826

Max Schoengold, of New York City, for San Carlo Opera Co.

Gins & Massler, of New York City (Montrose H. Massler, of New York City, of counsel), for Eugene Conley.

LEIBELL, District Judge.

Eugene Conley, one of the parties to the arbitration, was employed by the San Carlo Opera Company, the other party thereto, as a tenor in the performance of various operatic compositions throughout the United States in the early 1940s. Subsequently Conley became a member of the armed forces of the United States terminating his services for the company. On June 30, 1944, Conley, through his authorized representative, Ettore Verna, entered into an option agreement in writing with the San Carlo Opera Company, while he was still a member of the armed forces. The option agreement provided in part:

"That for and in consideration of the mutual promises and covenants herein con-tained and the sum advanced of $1500 and for other good and valuable considerations by the Company unto the Artist in hand paid, receipt whereof is hereby acknowl-edged, and, in consideration of the grant-ing of the irrevocable option hereinafter set forth, by the artist to the Company:

The Artist does hereby grant unto the Company an irrevocable option to obtain the sole and exclusive services of the Art-ist as a Tenor singer of leading roles in grand opera for a period of three years commencing from the date of the exercise of the said option by the Company.

The said option is to be exercised by the Company on or before six weeks after the Artist shall have notified the Com-pany by registered mail of his honorable discharge from the United States Army. The Artist agrees to notify the Company immediately upon his discharge from the army. The Company agrees to notify the Artist of its election to exercise the said option on his services * * *.

*    *    *    *    *    *

"It is agreed and understood by the par-ties hereto that the services of the Artist are unique, peculiar, extraordinary and of great value to the Company and impossible of replacement * * *.

*    *    *    *    *    *    ;

"This contract shall be subject to all the terms and provisions of the basic agree-ment now or hereinafter existing between the Company and the American Guild of Musical Artists Inc. and the parties agree that upon the exercise of the option of the Company they will enter into an Artist's Agreement with each other in accordance with the said basic agreement and the terms herein agreed upon."

Appended to this agreement is a printed standard contract form entitled "Standard Artist's Contract for Employment", execu-ted by the same parties who signed the option agreement, dated June 30, 1944, and bearing the legend "The attached agree-ment is a part of the Contract". This con-tract contains the following provision: "Arbitration. The Employer and the Art-ist hereby jointly and severally agree that any controversy or claim arising out of or relating to this contract or the breach

thereof, or any controversy whatsoever between the Employer and the Artist, shall be settled by arbitration, in accordance with the provisions of the Basic Agreement and the rules, then obtaining, of the American Arbitration Association (except as may otherwise be provided in Agma Rules), and judgment upon the award rendered may be entered in the highest court of the Forum, State or Federal, having jurisdiction."

The basic agreement, referred to in the main option contract and in the standard form contract, was entered into on December 24, 1942 by the San Carlo Opera Company and the American Guild of Musical Artists, Inc. Among other things the basic agreement states that its provisions shall apply to and inure to the benefit of all artists employed or engaged by the San Carlo Opera Company and in paragraph 12 it provides that every contract between San Carlo and any artist shall be deemed to contain a quoted arbitration clause, for the submission of any disputes or controversies to arbitration. The quoted arbitration clause is the same as that contained in the standard form contract set forth above. The clause provides for a method of selecting the arbitrators and umpire and for the prompt hearing and decision of the issues.

Sometime after the execution of these agreements and in December of 1945 Conley was honorably discharged from the armed forces. On December 8, 1945 the San Carlo Opera Company, having learned of the artist's discharge, exercised the option under the agreement of June 30, 1944, by directing a letter to Conley via registered mail notifying him of this fact and requesting him to report at certain designated places to sing operatic roles.

Conley failed and refused to undertake any performances for or at the direction of the company. On March 13, 1946 the San Carlo Opera Company filed with the American Arbitration Association a demand for arbitration under the terms of the above mentioned agreements, seeking to establish the validity of the contract of employment, the breach thereof and an assessment of damages. San Carlo named Milton Weir as its arbitrator. On April 4, 1946, Conley filed a reply denying the validity of the company's claims and designated Lawrence Tibbet as his arbitrator. A list of names was submitted to the two arbitrators for the purpose of selecting a third arbitrator or umpire. Apparently Milton Weir did not indicate any preferences and Lawrence Tibbet selected as fourth in the order of preference a Mr. Saul Abraham. After attempting to secure the services of other persons to act as the third arbitrator, the American Arbitration Association designated Saul Abraham to serve as umpire.

On May 10, 1946 the first hearing of the board of arbitrators was held. Counsel for Conley alleges that it was at the conclusion of this hearing that he first learned of negotiations then in progress for a contract between the League of New York Theatres, Inc., and the Association of Theatrical Agents and Managers and that Milton Weir and Saul Abraham were respectively counsel to and president of the two organizations conducting the negotiations.

When the hearing resumed on May 13, 1946 counsel for Conley requested an adjournment for the purpose of presenting to the appropriate committee of the American Arbitration Association the above facts concerning Weir and Abraham. During the discussion concerning the adjournment the following was stated on the record:

"Arbitrator Weir: Is it your intention, Mr. Massler, if the adjournment is granted to you, to abide by the ruling of the Arbitration Committee of the American Arbitration Association?

"Mr. Massler: We have no alternative.

"Arbitrator Weir: If an adjournment is granted to you and the Arbitration Committee should rule that none of the rules of the organization have been violated and that the three arbitrators are competent to serve, will it be your position then that you are obliged to abide by that ruling and will you proceed?

"Mr. Massler: There is no question about that."

Thereafter a recess was had during which the counsel for the parties and the arbitra-

tors conferred. The hearing was resumed and the following was stated on the record:

"Arbitrator Weir: Will you state on the record why the adjournment is satisfactory to you?

"Mr. Massler: It was satisfactory because it was developed during the course of the conference that Mr. Abraham will not longer be the president of the union which is in negotiations with the association which is represented by Mr. Weir on or after June 11, 1946, and accordingly, with the adjournment granted, I presume we have no matter at present to submit to any committee.

"Arbitrator Weir: I now apprise you that the negotiations will be still in progress on June 17 between the respective organizations. Can you assure us now that there will no longer be any ground of opposition by you?

"Mr. Massler: Well, if Mr. Abraham is no longer an officer of the union and has no further part in the negotiations, that will no longer constitute, in so far as we are concerned, a request for adjournment."

During the period of adjournment and on June 11, 1946, counsel for Conley applied to the American Arbitration Association for a hearing before the proper committee of the association on his objections to the arbitrators. The Committee found that: "There is no evidence of disqualification of either Saul Abraham or Milton Weir". Thereafter, on July 11, 1946, counsel for Conley petitioned this court for an order to show cause why Milton Weir and Saul Abraham should not be disqualified from continuing to act as arbitrators and obtained a stay of the arbitration proceeding pending the determination of the motion. On July 17, 1946 counsel for the company petitioned the court for a counter order dismissing the artist's order to show cause and vacating the stay of arbitration proceedings contained therein, on the ground that this court did not have jurisdiction over the proceeding under §§ 112 and 113 of Title 28 U.S.C.A., and for such other and further relief as might be just and proper.

The specific questions presented by the two motions are: (1) Whether the court has jurisdiction to hear the application to disqualify the arbitrators; and (2) Whether, if jurisdiction exists, the court is vested with the power to disqualify any arbitrators appointed pursuant to the contract of the parties, before a determination or award by the board of arbitrators.

■ Title 9 of the U.S.C.A. is entitled: "An act to make valid and enforceable written provisions or agreements for arbitration of disputes arising out of contracts, maritime transactions, or commerce among the States or Territories or with foreign nations." 43 Stat. 883. This statute is the basis of a federal court's jurisdiction over matters pertaining to arbitration agreements. In order to fix jurisdiction under the Act it is necessary to establish three elements, which are set forth in 3 Moore, Federal Practice 3426, n. 12, as follows:

"In order for a federal court to entertain an action under 9 U.S.C. [9 U.S.C.A.] there must be (1) diversity of citizenship, Krauss Bros. Lumber Co. v. Louis Bossert & Sons, Inc., 2 Cir., 1933, 62 F.2d 1004; (2) the proper amount in controversy, In re Woerner, 2 Cir., 1929, 31 F.2d 283; cf. In re Red Cross Line, D.C.,S.D.N.Y., 1921, 277 F. 853, decided prior to the federal act; and (3) the matter must relate to maritime transactions or interstate commerce, Krauss Bros. Lumber Co. v. Louis Bossert & Sons, Inc., supra; In re Cold Metal Process Co., D.C.,W.D.Pa., 1935, 9 F.Supp. 992."

Eugene Conley is a citizen of the Commonwealth of Massachusetts and the San Carlo Opera Company is a corporation organized under the laws of the State of Delaware. The requisite diversity of citizenship thus appears. But the company objects under Sections 112 and 113 of Title 28 of the U.S.C.A., on the ground of improper venue. The San Carlo Opera Company is authorized to do business in the State of New York; the contract between the American Guild of Musical Artists, Inc., and San Carlo states that its principal place of business is at 1697 Broadway, New

York; the contract between Conley and San Carlo was made in New York although the breach thereof appears to have occurred outside the territorial limits of that state. Upon these facts the cases of Louisville & Nashville R. Co. v. Chatters, 279 U.S. 320, 49 S.Ct. 329, 73 L.Ed. 711; Neirbo Co. v. Bethlehem Shipbuilding Corp., 308 U.S. 165, 60 S.Ct. 153, 84 L.Ed. 167, 128 A.L.R. 1437 and Gilbert v. Gulf Oil Corp., 2 Cir., 1946, 153 F.2d 883, are dispositive of the issues of venue in so far as jurisdiction rests upon diversity of citizenship. Other facts which could be noted on the venue question are that, pursuant to the terms of the agreement the arbitration was to be and actually was being conducted in New York City within the territorial jurisdiction of this court and that the basis of the movant's application is a dispute arising, not out of the contract of the parties, but out of the conduct of the arbitration proceedings themselves.

The second requisite to federal jurisdiction under the Arbitration Act, the amount involved in the controversy, is satisfied because the San Carlo Opera Company in its demand for arbitration alleges damages in the sum of $5,000 and a liquidated claim for $1,500.

The third requisite to federal jurisdiction under the provisions of the United States Arbitration Act is that the dispute relate to a maritime transaction or a contract involving interstate or foreign commerce. 9 U.S.C.A. § 1, 43 Stat. 883, sets forth certain definitions of the terms "maritime transactions" and "commerce" as used in the Arbitration Act. After defining "commerce" as "commerce among the several States or with foreign nations" etc, it provides that "nothing herein contained shall apply to contracts of employment of seaman, railroad employees, or any other class of workers engaged in foreign or interstate commerce".

Section 2 of the Act provides:

"§ 2. Validity, irrevocability, and enforcement of agreements to arbitrate

"A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. Feb. 12, 1925, c. 213, § 2, 43 Stat. 883."

Among the "remedies" afforded by the Act is the right under § 3 to a stay of the trial of an action pending in a federal court if it is "upon any issue referable to arbitration under an agreement in writing for such arbitration". It has been held that the stay may be granted even though the action did not arise out of a maritime transaction or a contract relating to interstate or foreign commerce. See Donahue v. Susquehanna Collieries Co., 3 Cir., 1943, 138 F.2d 3, 149 A.L.R. 271; Shanferoke Coal & Supply Corp. v. Westchester Service Corp., 2 Cir., 70 F.2d 297. This view was followed in Agostini Bros. Bldg. Corp. v. United States, 4 Cir., 1944, 142 F.2d 854 and Watkins v. Hudson Coal Co., 3 Cir., 1945, 151 F.2d 311. The contrary view is represented by Gatliff Coal Co. v. Cox, 6 Cir., 1944, 142 F.2d 876; Zip Mfg. Co. v. Pep Mfg. Co., D.C.,D.Del., 1930, 44 F.2d 184; In re Woerner, 2 Cir., 1929, 31 F.2d 283.

The Conley application is not for the stay of an action pending in this Court. Section 3 of the Act does not apply. His application relates to the qualifications of the arbitrators, and seeks to have them adjudged as disqualified to act as arbitrators in a pending arbitration.

Another remedy afforded by the Act is by way of a petition to the federal court having jurisdiction for an order to compel arbitration under the arbitration clause of a contract. Section 4 of the Arbitration Act empowers the courts to compel arbitration in certain types of cases. An examination of the authorities reveals that Section 4, unlike Section 3, is limited to certain defined types of contracts or transactions which are declared "enforceable" under § 2 of the Act. Section 2 of the Act recognizes the validity, irrevocability and

enforceability of agreements to settle by arbitration a controversy arising out of any maritime transaction or "a contract evidencing a transaction involving commerce" and Section 4[1] gives the federal courts the power to effect that enforceability by an order to compel arbitration.

It has been held that only those types of contracts described in Section 2 come within the scope of Section 4, thus attaching to Section 4 the limitation of maritime transactions or contracts relating to interstate or foreign commerce. In Krauss Bros. Lumber Co. v. Louis Bossert & Sons, 2 Cir., 1933, 62 F.2d 1004, 1006, Judge Learned Hand in discussing Section 4, said: "We have no doubt that the District Court had jurisdiction over the suit. A difficulty might arise if jurisdiction depended only upon the fact that the contract 'involved commerce', that is, required shipment from one state to another; but the statute does not rest the court's power on that ground. * * * The text is entirely clear that the court must be one 'which, save for such agreement, would have juris-

diction * * * of the subject matter.' Section 4 of title 9 U.S.C.A. The remedy is not even coextensive with the jurisdiction; for instance, the controversy may arise between citizens of different states, and the contract not 'involve commerce.' A citizen of New Jersey may enforce arbitration against a citizen of New York upon a contract of sale which requires him to ship the goods from Newark to Manhattan, but not upon one when they are to go from Manhattan to the Bronx."

This interpretation of § 4 in relation to § 2 was reaffirmed by the same court in Shanferoke Coal & Supply Corp. v. Westchester Service Corp., supra [70 F.2d 298], where the court in observing that it did not think Section 3 of the Act to be burdened with the limitations of Sections 1 and 2 of the Act said: "We are not clear that this is true; section 2 defines those contracts which it makes 'valid, irrevocable and enforceable,' and no doubt such alone are within section 4."

The movant's application to disqualify the arbitrators is not a remedy set forth

---

[1] "§ 4. Failure, etc., to arbitrate under agreement; petition to United States court having jurisdiction for order to compel arbitration; notice and service thereof; hearing and determination

"A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any court of the United States which, save for such agreement, would have jurisdiction under the judicial code at law, in equity, or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five days' notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the manner provided by law for the service of summons in the jurisdiction in which the proceeding is brought. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an or-

der directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by law for referring to a jury issues in an equity action, or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof. Feb. 12, 1925, c. 213, § 4, 43 Stat. 883."

in the Arbitration Act but he urges that if the court would have had authority, pursuant to Section 4, to order an arbitration herein and appoint arbitrators pursuant to Section 5 then the court has jurisdiction over an application to disqualify arbitrators. See Marine Transit Corp. v. Dreyfus, 284 U.S. 263, 275, 276, 52 S.Ct. 166, 76 L.Ed. 282. But since the question of jurisdiction under Section 4 is dependent upon whether the arbitration clause was a provision in a maritime transaction (not applicable here) or in a contract, one evidencing a transaction involving commerce, it becomes necessary to examine the pertinent facts to determine if the contract for the employment of Conley was a contract in interstate commerce.

Conley entered into an agreement giving the San Carlo Opera Company an option on his services as an operatic tenor in leading roles. If the agreement had been carried into effect Conley would have been required to travel through the various states giving performances at individual opera houses as arranged by the San Carlo Company. His travel expenses, pursuant to the terms of the agreement, would have been paid by the San Carlo Company. But those facts would not make his contract one involving interstate commerce. In Federal Base Ball Club v. National League, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898, 26 A.L.R. 357, Justice Holmes stated at pages 208 and 209 of 259 U.S., at page 466 of 42 S.Ct.: "The business is giving exhibitions of baseball, which are purely state affairs. It is true that in order to attain for these exhibitions the great popularity that they have achieved, competitions must be arranged between clubs from different cities and States. But the fact that in order to give the exhibitions the Leagues must induce free persons to cross state lines and must arrange and pay for their doing so is not enough to change the character of the business. According to the distinction insisted upon in Hooper v. California, 155 U.S. 648, 655, 15 S.Ct. 207, 39 L.Ed. 297, the transport is a mere incident, not the essential thing. That to which it is incident, the exhibition, although made for money would not be called trade or commerce in the commonly accepted use of those words. As it is put by the defendant, personal effort, not related to production, is not a subject of commerce. That which in its consummation is not commerce does not become commerce among the States because the transportation that we have mentioned takes place. To repeat the illustrations given by the Court below, a firm of lawyers sending out a member to argue a case, or the Chautauqua lecture bureau sending out lecturers, does not engage in such commerce because the lawyer or lecturer goes to another State."

In cases involving the performance of vaudeville acts the courts have held that contracts for the personal services of the entertainers were not the subject of commerce, even though the entertainers were required to go from state to state. Neugen v. Associated Chautauqua Co., 10 Cir., 1934, 70 F.2d 605; Hart v. B. F. Keith Vaudeville Exchange, 2 Cir., 1926, 12 F.2d 341, 47 A.L.R. 775. The force of these cases as precedents has been questioned in Ring v. Spina, 2 Cir., 1945, 148 F.2d 647, 650,[2] 160 A.L.R. 371. However, that court was not considering a contract for the individual performance of an artist, such as is here involved, but was concerned with the preparation and presentation of a musical comedy involving many people and incidents to the preparation. The court said: "Even if we thought that this present case concerned only a musical play being prepared in the provinces for Broadway, we should doubt the presently controlling force of these precedents. Employment contracts for separate exhibitions seem to us quite different from the substantial business of readying a musical comedy through tryouts on the road for New York production. There must be the securing of services of countless actors, actresses, members of choruses, and others, of scenery, music, and appropriate lighting, then the strenuous activities required to weld all these parts into a delectable whole, the judicious advertising, and all the other details to such a production, so extensive in fact that it

---

[2] In North American Co. v. S. E. C., 327 U.S. 686, 66 S.Ct. 785, 791, 90 L. Ed. 945, the Supreme Court cited the Federal League case with approval.

seems not unusual for a single play to be separately incorporated as a business corporation. And the road tryouts—here, from New Haven to Boston to Philadelphia—are an essential part of the fashioning of a perfect product for the Broadway trade. Moreover, there is no doubt of the steadily expanding content of the phrase 'interstate commerce' in recent years; and hence there is no longer occasion for applying these earlier cases beyond their exact facts."

The facts in the present case are a far cry from those considered in the Ring case above and are particularly suited to the application of the doctrine of the Federal League, Neugen and Hart cases.

■ Since the contract does not evidence a transaction arising out of interstate or foreign commerce as set forth in Section 2 of the United States Arbitration Act this Court would have no authority to compel arbitration under Section 4 or to appoint arbitrators in furtherance of the arbitration under Section 5. It is difficult to find any ground for the jurisdiction of this court over the present application.

Although it is really unnecessary to consider the second question raised by the motions, viz., whether the court is vested with the power to disqualify arbitrators appointed pursuant to the contract of the parties, before a determination or award by the board of arbitrators, I feel that an expression of my views may not be amiss, even as obiter dictum.

The parties, by their contract, voluntarily agreed to submit the dispute to arbitration in accordance with the rules of the American Arbitration Association. Rule I of these rules provides: "1. Agreement of Parties—The parties shall be deemed to have made these Rules a part of their arbitration agreement whenever, in the submission or other written agreement, they have provided for arbitration by the American Arbitration Association or under its Rules. These rules and any amendment thereof shall apply in the form obtaining at the time the arbitration is initiated."

The rules thus were made a part of the arbitration clause of the contract. The dispute was submitted and the arbitrators were appointed pursuant to the terms of the contract and the rules of the American Arbitration Association. The arbitration proceeded according to the rules and upon the movant's objection to the arbitrators a hearing was had before a special committee of the Association to pass upon the question. That practice appears to be in accord with the rules. Rule IV, sub. 11-19 provides for the appointment of arbitrators and sets forth the qualifications and manner of appointment. Subdivision 18 provides that upon notice of appointment the prospective arbitrator is requested to disclose any circumstances that would create a presumption of bias or which he believes might disqualify him as an impartial arbitrator. Although the rules of the Association do not provide in so many words for the removal of arbitrators, subdivision 19 of Rule IV does provide: "If any arbitrator should resign, die, withdraw, refuse or be unable or disqualified to perform the duties of his office, the Administrator shall, on proof satisfactory to it, declare the office vacant."

The procedure before the special committee of the Administrator then appears to have been the customary practice and to be a determination of the question involved in Conley's objection to the arbitrators in accordance with Subdivision 19 of Rule IV.

■ The application to the court for the removal of the arbitrators is not one of the remedies set forth in the United States Arbitration Act, 9 U.S.C.A. 1 et seq. For the court to entertain the application would amount to the exercise of a right to change the terms of the contract. See Modern Brokerage Corp. v. Massachusetts B. & I. Co., D.C.,S.D.N.Y., 1944, 56 F. Supp. 696. In Kulukundis Shipping Co. v. Amtorg Trading Corp., 2 Cir., 1942, 126 F.2d 978, 985, the court noted: "The report of the House Committee stated, in part: 'Arbitration agreements are purely matters of contract, and the effect of the bill is simply to make the contracting party live up to his agreement. He can no longer refuse to perform his contract when it becomes disadvantageous to him. An arbitration agreement is placed upon the same

footing as other contracts, where it belongs. * * *'"

■ The power of the courts, to set aside an award of a board of arbitrators, after bias or prejudice is shown, is well settled. Sections 10–12, United States Arbitration Act, 9 U.S.C.A. §§ 10–12; Williston, Contracts, § 1923–A; American Eagle Fire Ins. Co. v. New Jersey Ins. Co., 240 N.Y. 398, 148 N.E. 562. But where the dispute has proceeded to arbitration, the court does not appear to have the power to order a substitution of arbitrators. In Williston, Contracts, 1923, it is observed: "The American statutes contain no provision for vacating the office of arbitrator in the event he is shown to be biased or prejudiced during the proceeding. In states where arbitration agreements are revocable, of course, a party discovering bias could revoke the submission, but under the modern arbitration statutes there seems little way the question of bias or prejudice can be tested, prior to an award, unless it be by injunction."

It has been held that where there was an arbitration by consent of the parties, even though such arbitration be made a rule of the court, the court has no general power, without the consent of the parties, to make a substitution of arbitrators. Smith v. Warner, 14 Mich. 152. If the arbitrators have been appointed by the court, and the question of the disqualification of an arbitrator is raised before the arbitration has commenced, it appears the court has the power to modify or change its original order by effecting a change of arbiters for cause shown. See Western Union Telegraph Co. v. Selly, Sup., 60 N. Y.S.2d 411, affirmed 270 App.Div. 839, 61 N.Y.S.2d 911.

■■ Where a party to an arbitration has knowledge of facts possibly indicating bias or prejudice on the part of an arbitrator he cannot remain silent and then later object to the decision of the arbitrators on that ground. His silence and inaction constitute a waiver of the objection. Chicago, Rock Island & P. R. Co. v. Union Pacific R. Co., 8 Cir., 254 F. 235. Here, however, Conley has made timely objection before the arbitrators and before the Administrator under the rule of the American Arbitration Association. Since such objection has been overruled, in my view of the matter, he should proceed with the arbitration pursuant to the terms of his contract. He thus will exhaust his remedies within the rules of the Association and he will not be precluded from reasserting his objection, if necessary, when the confirmation of the award of the arbitrators comes before the proper judicial tribunal.

For the foregoing reason Conley's motion for the removal of the arbitrators is denied, and the motion of the San Carlo Opera Company to vacate for lack of jurisdiction the show cause order of the court is granted.

Settle an appropriate order on two days' notice in accordance with this opinion.