William P. ROGERS, Attorney General of
the United States, Plaintiff,

v.

SCHERING CORPORATION, Defendant.
No. C–1168–52.

United States District Court
D. New Jersey.
Aug. 11, 1958.

**296**

Chester A. Weidenburner, U. S. Atty., Newark, N. J., by Barbara A. Morris, Asst. U. S. Atty., Montclair, N. J., for plaintiff.

Allan L. Tumarkin, Newark, N. J., Montrose H. Massler, New York City, of counsel, for Hexagon Laboratories, Inc.

Milton, McNulty & Augelli, Jersey City, N. J., by Anthony T. Augelli, Jersey City, N. J., George B. Finnegan, Jr., New York City, William D. Denson, Washington, D. C., of counsel, for defendant.

FORMAN, Chief Judge.

This matter arises on a motion by the Schering Corporation (Schering) to confirm an arbitration award. A countermotion by Hexagon Laboratories, Inc. (Hexagon), the other party in the arbitration proceeding, seeks to vacate the award. The pertinent background is as follows:

In April 1942, following the outbreak of hostilities between the United States and Germany, and pursuant to the Trading with the Enemy Act, 50 U.S.C.A. Appendix, § 1 et seq., Schering, owned by German interests, was vested in the Alien Property Custodian who became the sole common stockholder, and who eventually, by 1949, became the sole holder of all stock, preferred as well as common. On March 13, 1952 the Schering stock was sold to the general public, through underwriters, for approximately $29,000,000. Prior thereto, an agreement was entered into between the Attorney General (as successor to the Alien Property Custodian) and Schering, dated January 1, 1952,[1] whereby certain Schering-held patents were transferred to the Attorney General and became part of the public domain free of license or royalty.

Schering was allowed to keep other patents but subject to being licensed on a non-exclusive basis at a "reasonable royalty," the terms of such royalty to be arrived at by negotiation between Schering and the applicants. If the parties were unable to agree on a reasonable royalty by negotiation, the matter was to be determined by arbitration, as provided by Article VI, Par. C(2) of the said agreement with the Attorney General, which reads as follows:

"(2) If the applicant and Schering have been unable to agree, within 60 days from the date such application is received by Schering, upon what constitutes a reasonable royalty, the applicant may forthwith give written notice to Schering that it elects to submit to arbitration, in accordance with the rules then obtaining of the American Arbitration Association, the determination of a reasonable royalty for the requested license, the arbitration tribunal to consist of three arbitrators, all of whom shall be citizens and residents of the United States, selected from the panels of arbitrators of the American Arbitration Association,

---

1. For a discussion of the challenge to this agreement by Schering, see Brownell v. Schering, D.C.N.J.1955, 129 F.Supp. 879, affirmed 3 Cir., 1956, 228 F.2d 624, certiorari denied 1956, 351 U.S. 954, 76 S. Ct. 849, 100 L.Ed. 1477.

*in accordance with the rules of said Association.*" (Emphasis supplied.)

On July 6, 1956 Hexagon, as a bulk manufacturer, applied for a license[2] under Schering's Patent No. 2,567,245 for an anti-histamine, the generic name of which is chlorprophenpyradimine maleate. The parties were unable to agree on the amount of royalty to be paid, and the matter was submitted to the American Arbitration Association pursuant to the Agreement.

A panel of three arbitrators was selected, consisting of Jerome Handler, Chairman, S. H. Bergstrom, and John H. Schwoon. This panel commenced hearing the arbitration proceeding on December 20, 1956, at which time little more than opening statements were made by counsel. After a noon recess, it was announced by Mr. Handler, the chairman, "That in view of Mr. Bergstrom's unavailability after December 25, that the AAA designate a new arbitrator in his place, but such new arbitrator will not be passed upon by any of the parties." Record, p. 30.

The next hearing was held on February 5, 1957 at which time Manfred Fanto, as Bergstrom's replacement, sat as a member of the arbitration board. Following a full day of testimony, the hearing was adjourned to February 14, 1957.

When the meeting convened on that day, counsel for Hexagon brought to the attention of the board the fact that it (Hexagon) had learned that the Van Gelder-Fanto Corporation, importers and distributors of chemicals, of which Mr. Fanto is Vice President, had done business with Schering; that Mr. Fanto had disclosed this fact to the American Arbitration Association in response to its inquiry concerning any circumstances capable of suggesting bias or possible disqualification; and that this disclosure had not been communicated to Hexagon.

Hexagon's counsel raised the issue of failure of notice to Hexagon of the disclosure made by Mr. Fanto to the Association, and that of Mr. Fanto's disqualification thereby, as the first order of business at the meeting of February 14th. No change resulted.

The hearings ended January 23, 1958, after four additional days of hearings and a total in excess of 700 pages of testimony. On February 25, 1958 the arbitrators made known their award, fixing Hexagon's royalty payments at "50% of the net selling price of said substance or drug when sold by it in bulk * * or 10% of the net selling price of said substance or drug when sold by it in final packaged form * * *."

Since the matter before the court arose out of an agreement between the Attorney General of the United States and Schering, it would appear that the Federal Arbitration Act, 9 U.S.C. § 1 et seq. has application here. In any event, the provisions of the federal act with regard to vacation of awards, Section 10, are practically identical with the provisions of the New Jersey Statute, N.J.S.A. 2A:24–8.

Hexagon bases its first objection to the award on the irregularity of the service of Mr. Fanto on the Board of Arbitrators as coming within the provisions of the federal statute, which is as follows, 9 U.S.C. § 10:

> "In either of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—"
>
> *     *     *     *     *
>
> "(b) Where there was evident partiality or corruption in the arbitrators, or either of them."

At the outset it should be emphasized that Mr. Fanto, with complete candor, disclosed to the Association that the firm of which he was Vice President, Van Gelder-Fanto Corporation, had in fact transacted business with Schering.

---

2. A previous application in 1952 was not successfully concluded, and Hexagon withdrew its application.

Schering states that Van Gelder-Fanto Corporation's business relationship with it consisted of one transaction, and insists that such a situation hardly constitutes a "business relationship" in the usual intendment of the phrase. It further states that "the matters now complained of by Hexagon were known to it long prior to the making of the award [and a] party to an arbitration will not be permitted to repudiate an award for causes within his knowledge before it was made"; and that Hexagon had not exhausted remedies available to it—within the Association—for the removal of Mr. Fanto.

The questions are raised—whether Mr. Fanto's appointment was made in conformity with the Commercial Arbitration Rules as published by the American Arbitration Association, and if not, had Hexagon done all that could be expected of it, under the circumstances, to have Mr. Fanto removed.

There is no disputing the fact that Mr. Fanto's disclosure to the Arbitration Association of an earlier business transaction with Schering was not transmitted by the Tribunal Clerk to Hexagon.

Schering submitted an affidavit of John Eastman, Jr., Vice President of the American Arbitration Association, in which he states that Mr. Fanto's appointment was made in accordance with Section 12 of the Rules, which is as follows:

"Section 12. Appointment from Panels—If the parties have not appointed an Arbitrator and have not provided any other method of appointment, the Arbitrator shall be appointed in the following manner: Immediately after the filing of the Submission or copy of a Demand, as required under Rule III, the Tribunal Clerk shall submit simultaneously to each party to the dispute, an identical list of names of persons chosen from the Panels. Each party to the dispute shall have seven days from the date of mailing of such lists in which to examine said list, cross off any names to which he ob-

jects and number the remaining names indicating the order of his preference, and return the list to the Tribunal Clerk. When any party or both parties fail to return the list within the time specified all persons named therein shall be deemed acceptable. From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference if any, the Tribunal Clerk shall invite the acceptance of an Arbitrator to serve. If the parties fail to agree upon any of the persons named or if those named decline or are unable to act, *or if for any other reason the appointment cannot be made from the submitted lists,* the Administrator shall have power to make the appointment from other members of the Panels without the submission of any additional lists. (Emphasis supplied.)

Mr. Eastman then makes reference to Section 18 of the Rules which is as follows:

"Section 18. Disclosure by Arbitrator of Disqualification—At the time of receiving his notice of appointment, the prospective Arbitrator is requested to disclose any circumstances likely to create a presumption of bias or which he believes might disqualify him as an impartial Arbitrator. Upon receipt of such information the Tribunal Clerk shall immediately disclose it to the parties, who if willing to proceed under the circumstances disclosed, shall, in writing, so advise the Tribunal Clerk. If either party declines to waive the presumptive disqualification, the vacancy thus created shall be filled in accordance with the applicable provisions of this Rule."

He explains in his affidavit that the latter Rule

"is not applicable to appointments made administratively by the Association to fill a vacancy created by the inability of an arbitrator to

serve. In accordance with the provisions of Section 52 of said Rules reading in part as follows: 'All other rules shall be interpreted and applied by the Administrator', the Association has for the last thirty years interpreted said Rules to mean that in cases where arbitrators are appointed administratively, no information given the Administrator by the potential arbitrator relating to circumstances likely to create a presumption of bias as referred to in Section 18 of said Rules, is given to the parties to the arbitration proceeding."

■ Article VI, Par. F(3) of the Attorney General's agreement provided that "the arbitration be conducted according to the rules then obtaining of the American Arbitration Association."

In this case, it appears that the list of names submitted to the parties by the Association, (referred to in the Rules as the Administrator), failed to gain their approval. Therefore, the Administrator properly assembled a Board of Arbitrators of its own choice without submitting additional lists to the parties. It is to be presumed that the members of this Board were given the notice as provided in Section 17 as follows:

"Section 17. Notice of Appointment to Arbitrator—Notice of the appointment of the Arbitrator, whether appointed by the parties or by the Administrator, shall be mailed to the Arbitrator by the Tribunal Clerk and the signed acceptance of the Arbitrator shall be filed with the Tribunal Clerk prior to the opening of the first hearing. Together with such notice to the Arbitrator, the Tribunal Clerk shall enclose a copy of the Rules and call attention to the requirements of Sections 11 and 18 of these Rules."

Section 11 reads:

"Section 11. Qualifications—No person shall serve as an Arbitrator in any arbitration if he has any financial or personal interest in the result of the arbitration, unless the parties, in writing, waive such disqualification."

It is to be further presumed that had any proposed arbitrator replied disclosing "any circumstances likely to create a presumption of bias," such information would have been communicated to the parties by the Tribunal Clerk pursuant to Rule 18.

■ But it is Schering's position, based on the assertion of Mr. Eastman, that the Association has interpreted the Rules to mean that *if a vacancy is created*, the prospective replacement Arbitrator will be queried about circumstances likely to create a presumption of bias and if there is a disclosure of such circumstances, the Administrator is under no duty to advise the parties. In other words, in this case, Schering contends that since Mr. Fanto was appointed to replace Mr. Bergstrom, there was no obligation on the Administrator to communicate to Hexagon any disclosure concerning bias as made to it by Mr. Fanto. Notwithstanding Mr. Eastman's statement that this had been the practice of the Association for 30 years, there appears to be little else to support it either in logic or in the clear mandate of the Rules themselves which were specifically ordained to govern the arbitration procedure contemplated in the agreement of January 1, 1952. Is it less important for the parties to be informed of these circumstances revealed in the response solicited by the Association concerning a replacement arbitrator than an original arbitrator? The question would appear to answer itself.

The fact that appointment of arbitrators could be made by the Administrator without submitting additional lists to the parties as provided in Section 12 cannot reasonably be said to exclude the operation of Section 18, for even where vacancies are concerned, they are governed by Section 19 which reads as follows:

"Section 19. Vacancies—If any Arbitrator should resign, die, withdraw, refuse or be unable or disqualified to perform the duties of his office, the Administrator shall,

on proof satisfactory to it, declare the office vacant. *Vacancies shall be filled in accordance with the applicable provisions of this Rule* and the matter shall be reheard unless the parties shall agree otherwise. (Emphasis supplied.)

■ The provision in Section 12 that in the event of the listed names being disapproved by the parties the Administrator shall choose the members of the board of arbitrators, is analogous to the exhaustion by the parties of their peremptory challenges in a court of law. The limiting of peremptory challenges is an understandable and in fact necessary exercise of the judicial or quasi judicial function. But when the Association is informed by a prospective arbitrator in response to its inquiry, of circumstances which are "likely to create a presumption of bias," nothing less than a prompt communication of such disclosure to the parties, even where the filling of a vacancy is concerned, provides the affected party with an opportunity to challenge "for cause." Nor is it sufficient for the Association to take

the position that *it* weighed the disclosure and concluded that it did not affect the eligibility of the proposed arbitrator. The party should have the right to argue the matter with the appointing authority before the appointment is effected. The party may well have a sensitivity to the disclosure not realized by the appointing authority, and while in the ultimate its objection may not be justified, it should not be deprived of at least the opportunity to convince the appointing authority of the desirability of selecting a replacement or even a further replacement.

In this case, Mr. Eastman treats Mr. Fanto's disclosure in his affidavit in the following light:

"The information disclosed by Mr. Fanto to the Association, namely, that on one occasion in the past his company had sold certain raw material to Schering Corporation did not, in the opinion of the Association, constitute a basis for disqualification under Section 11 of said Rules nor constituted circumstances likely to create a presumption of bias."[3]

3. The principles involved, as expounded by Mr. Eastman, seem at variance with those advanced in "American Arbitration" by Frances Kellor, First Vice President of the American Arbitration Association, (Harper & Brothers, 1948.) The pertinent Commercial Arbitration Rules set forth in its Annex I are little changed from those in effect at the time of this proceeding.

Significantly, the author says, at page 76:

"To the *parties* is assigned the responsibility of: * * * (8) *passing upon circumstances that might constitute bias* * * *." (Emphasis supplied.)

Again on pages 106–107:

"In an effort to appoint the members of its Panel who are impartial, the Association also calls upon the person chosen for assistance. In the notice of appointment, and before returning his acceptance, the prospective arbitrator is asked to disclose any circumstances or facts which he believes might create a presumption of bias toward either party or toward the subject matter. When such facts or circumstances are disclosed, *they are transmitted to the parties who*

*may then accept or reject the arbitrator.* If they accept him, the circumstance is waived, but if either party objects, the appointment is withdrawn by the administrator.

"The screenings, through qualifications for membership on the Panel, by parties from lists, and by arbitrators of their own qualifications, may still be insufficient to assure complete impartiality. It sometimes occurs that in the actual process of arbitration, unforeseen circumstances arise that either create a suspicion of bias or give positive evidence of it.

"If during a proceeding an allegation of bias is made by a party, the administrator is empowered to hear the charge and, if satisfied that bias exists, it may vacate the office. A successor is chosen in the same manner as the original appointment was made.

"Under administered systems of arbitration, a clerk is always present at all hearings. Any situation that may develop which indicates an impairment of confidence in the Panel arbitrator's impartiality or conduct, or if any violation of the Rules which insure such impartiality appears, the clerk advises the adminis-

Without passing upon the merit of the question of Mr. Fanto's eligibility, it is suggested that if Hexagon had had an opportunity to argue to the Administrator that Mr. Fanto's firm engaged in a transaction involving some $2,200 a little over a year preceding his call to service as an arbitrator, the nature of the product involved in the transaction as related to the volume of this type of product utilized by Schering, and the very frank volunteered statement by Mr. Fanto that "it is certainly not excluded that we may do business with Schering in the future," it could, at least perhaps, have influenced the administrator to supply a replacement for Mr. Fanto.

I am not unaware that interference with an award by arbitrators should be considered with appropriate reluctance. It has been said that when the parties have adopted arbitration to settle their differences

"\* \* \* they must be content with its informalities; they may not hedge it about with those procedural limitations which it is precisely its purpose to avoid. They must content themselves with looser approximations to the enforcement of their rights than those that the law accords them, when they resort to its machinery." American Almond Products Co. v. Consolidated Pecan Sales Co., Inc., 2 Cir., 1944, 144 F.2d 448, at page 451, 154 A.L.R. 1205.

The failure of the Administrator to communicate to the parties information disclosed by a prospective arbitrator bearing upon circumstances likely to create a presumption of bias, and the consequent prevention of the party to proffer a timely objection based upon that information, is more than a loose procedural informality. It goes to the heart of a body designed to resolve controversy—its integrity. In this instance it fails to protect what might be termed "due arbitration process."

Schering makes the further objection that Hexagon's complaint concerning the qualifications of Mr. Fanto to sit on the Board comes too late at this stage of the proceedings, and that its proper recourse should have been to invoke its remedy under Section 19 of the Rules.

It appears that as soon as counsel for Hexagon ascertained from a source other than the Administrator that Mr. Fanto's firm had been involved in a transaction with Schering, he conveyed his information forthwith to the Tribunal Clerk and to Mr. Eastman. He was told that it was a matter for the arbitrators. His objection to Mr. Fanto's continuing to act was pressed at the beginning of the next session, at which Mr. Fanto was present, on February 14, 1957. Among other things, he said at that time:

"I state unequivocally that if I, as the attorney for the claimant, were aware of the facts as previously outlined, these facts had been communicated to me, I would under no circumstances have waived these facts and would have objected to Mr. Fanto's sitting as an arbitrator.

"At this stage I want to say there is no reflection personally upon Mr. Fanto's integrity, and I am not offering it as such at this moment.

"I must go a step further. In the informal discussion we had off the

---

trator. It may then confer with the parties as to the situation and arrange for a waiver or a withdrawal." (Emphasis supplied.)

And again on page 114:

"This type of administrator does not encroach upon the rights of the parties in a proceeding. The temptation is always in the direction of usurping rights and powers, especially when an administrator believes it can exercise these powers more expeditiously and effectively than can the parties. The Association has resisted such temptation and has found that slight delays in which to persuade the parties to exercise their prior rights is a much better way to promote the amity of a proceeding than for the administrator peremptorily to assume these rights upon a slight pretext of delays, or inefficiency of a party."

record, I disclosed practically what I have said now to the arbitrators and to Mr. Fanto. I indicated that I was an advocate, and it was suggested that I request Mr. Fanto, under the circumstances, to resign or disqualify himself. And he said he saw no reason to do so, and did not do so. This only multiplies my concern. * * *"

* * * * * *

"Would you [, Mr. Fanto,] care to answer my request that I made before, that since you know that my people feel uncomfortable, and since you are working without compensation, I felt that—I certainly wouldn't want to sit there. I feel that most people would feel the same way. A resignation or withdrawal on your part at this time would in no wise be a reflection on your qualifications. The fact that you are sitting there multiplies my concern." (Record, pp. 171, 172, 177)

Mr. Fanto declined to resign, and was defended in his action by Mr. Handler, the chairman of the arbitration board.

In the light of all the attendant circumstances—having seen the Tribunal Clerk and Mr. Eastman and having directly taken the matter to the arbitration board—further seeking of remedies within the Association (if, indeed, such remedies existed), could reasonably be viewed as a needless pursuit into futility. Moreover, Mr. Eastman's affidavit relative to the Association's interpretation of Section 18 of the Rules amply demonstrates this very fact.

The contention of Schering that Hexagon should have had recourse to Section 19 of the Rules seems devoid of merit. It provides that vacancies shall be filled in accordance with "the applicable provisions of this Rule * * *." It should be read together with Section 18 which it in no wise modifies, and it is not an administrative remedy for failure to comply with it, as Schering suggests.

In San Carlo Opera Co. v. Conley, D.C. S.D.N.Y.1946, 72 F.Supp. 825, 833 one of the parties to an arbitration petitioned the court for an order to remove two arbitrators on the grounds of disqualification *during a pending arbitration*. The court denied the motion saying:

"* * * Conley has made timely objection before the arbitrators and before the Administrator under the rule of the American Arbitration Association. Since such objection has been overruled, in my view of the matter, he should proceed with the arbitration pursuant to the terms of his contract. He thus will exhaust his remedies within the rules of the Association and he will not be precluded from reasserting his objection, if necessary, when the confirmation of the award of the arbitrators comes before the proper judicial tribunal."

The language of the court in setting aside an arbitration award in American Guaranty Co. v. Caldwell, 9 Cir., 72 F.2d 209, 212, appears pertinent. It said:

"The holding of the District Court that the appointment of R. E. Laley as arbitrator was irregular and illegal and that the award of said arbitrator was evidently partial, but not corrupt or fraudulent, was fully justified. The method of appointment as provided in the agreement was not followed, and the arbitrator appointed had a business relationship with one of the parties. These facts, taken together, warranted the setting aside of an award made by such an arbitrator as inherently partial, even though not corrupt or fraudulent."

I am constrained to hold that the appointment of Mr. Fanto as an arbitrator was irregular and illegal and that the award was evidently partial although not corrupt, within the meaning of Section 10(b) of the Federal Arbitration Act. 9 U.S.C.A. § 10(b).

Hexagon's motion to vacate the award is based on all four grounds of said Sec-

tion 10.[4] Since this finding alone is sufficient to vacate the award, Hexagon's other grounds for such action need not be passed upon here.

The motion of Schering to confirm the award will be denied and the counter-motion of Hexagon to vacate the award will be granted.

An order should be submitted by Hexagon with consent as to form by Schering but reserving its objections to substance, or it should be noticed for settlement on the first motion day at Newark in September.

---

4. 9 U.S.C.A. § 10.

"In either of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

"(a) Where the award was procured by corruption, fraud, or undue means.

"(b) Where there was evident partiality or corruption in the arbitrators, or either of them.

"(c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

"(d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. * * *"