658 F.2d 1285
 108 L.R.R.M. (BNA) 2761, 92 Lab.Cas. P 13,067
 LOCAL 1020 OF the UNITED BROTHERHOOD OF CARPENTERS AND
JOINERS OF AMERICA, Plaintiff-Appellant,
v.
FMC CORPORATION, and District Council 55 of the
International Brotherhood of Painters and Allied Trades,
AFL-CIO, and Laborers Local 296 of Laborers International
Union of North America, AFL-CIO, Defendants-Appellees.
 No. 78-3212.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 2, 1980.
Decided Oct. 13, 1981.
 
 C. David Whipple, Kansas City, Mo. (argued), for plaintiff-appellant; C. David Whipple, Whipple, Eisler & Kraft, Kansas City, Mo., Dwayne R. Murray, Doblie, Bischoff & Murray, Portland, Or., on brief.
 Donald S. Richardson, Richardson, Murphy & Nelson, Herbert B. Galton, Sidney A. Galton, Wayne D. Landsverk, Galton, Popick & Scott, Portland, Or., for defendants-appellees.
 Appeal from the United States District Court for the District of Oregon.
 Before ALARCON and CANBY, Circuit Judges, and HOFFMAN*, District Judge.
 HOFFMAN, District Judge:
 This is an appeal from the dismissal of a complaint by the United States District Court for the District of Oregon[1] filed by Local 1020 of the United Brotherhood of Carpenters and Joiners of America (Carpenters) against FMC Corporation (the employer or FMC), with District Council 55 of the International Brotherhood of Painters and Allied Trades, A.F.L.-C.I.O. (Painters), and Laborers Local 296 of Laborers International Union of North America, A.F.L.-C.I.O. (Laborers), being joined as interested parties pursuant to Rule 19 of the Federal Rules of Civil Procedure.
 Carpenters filed this action under § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a),[2] requesting that FMC be ordered to reassign the work of making "drop changes" in the cargo tanks of vessels under construction by FMC, to the end that this work would be done by Carpenters or, in the alternative, that the dispute be submitted to arbitration in accordance with the Collective Bargaining Agreement between Carpenters and FMC. The complaint was filed on August 31, 1977 and also alleges that the award of the Referee (arbitrator) in an arbitration which Carpenters, Painters and Laborers were all parties does not derive its "essence" from the documents presented to the arbitrator, same being the Pacific Trades Agreement and the Jurisdictional Policy of the Metal Trades Department of the A.F.L.-C.I.O., referred to herein.
 The basis for the District Court's action in dismissing the complaint was twofold: first, that since Carpenters, Painters, and Laborers had submitted this jurisdictional dispute to arbitration, which resulted in the "drop change" work not being assigned to Carpenters by a decision and award dated March 23, 1977, Carpenters' action under § 301(a) of the Labor Management Relations Act was time-barred by reason of the Federal Arbitration Act, 9 U.S.C. § 12, which provides a three month limitation for serving notice of a motion to vacate, modify, or correct an award; second, even if the Federal Arbitration Act did not specifically apply, the three months period could be considered as an appropriate standard of timeliness for seeking a review of the decision of a labor arbitrator and hence, since more than five months had passed by the time this action was filed, it was time-barred. For reasons herein stated, we affirm.
 The complaint, together with the exhibits attached thereto, fully states the case. The Collective Bargaining Agreement between Carpenters and FMC provides under Article 24, § 24.1, that
 The Unions agree that in the event any jurisdictional dispute shall arise with respect to the jurisdiction or work on any classification of employment, whether or not included in the schedule attached hereto, such dispute shall be settled by the local unions involved and/or the International Unions involved, and that pending the adjustment of the jurisdictional dispute, there shall be no stoppage of work.
 24.4 The provisions of this Article shall be equally binding upon the employer and the Unions.
 The Unions agree that in the event any jurisdictional dispute shall arise between the Unions signatory to this agreement, with respect to the jurisdiction of work on any classification of employment, whether or not included in the schedule attached hereto, such dispute shall be settled by the Unions in accordance with the Jurisdictional Policy of the Metal Trades Department AFL-CIO as amended May 10, 1968, which provides that pending the adjustment of a jurisdictional dispute, there shall be no stoppage of work.
 And under § 24.3 of the Pacific Coast Master Agreement, it is said as to § 24: "The provisions of this section of the General Agreement shall be equally binding upon the Employer and the Unions."
 Thus, even though Carpenters was not a signator to the Pacific Coast Masters Agreement, Carpenters, by its Collective Bargaining Agreement with FMC, had essentially incorporated by reference a procedure for the adjustment of any jurisdictional dispute by the Unions involved.
 The basis for the jurisdictional dispute between Carpenters, Painters and Laborers arose by reason of the operation of Albina Climbers which are power-operated platforms, also denominated as scaffolds or stages, used by FMC within the tanker which is being constructed. The workmen stand on the Climbers at various elevations above the ground, the floor, or deck where they are working. As the work progresses, it is necessary to move the particular Climber from one pair of cables to another, the Climber being suspended by two steel cables at opposite ends of the long, rectangular platform which are winched up and down to the desired elevation by electric motors.[3] Admittedly, the initial installation, maintenance, alteration or removal of the Climbers was work assigned to and reserved for Carpenters as this work was performed by shipwrights, aided by boilermakers, all of whom are and were members of the Carpenters' Union. However, FMC's paint superintendent had developed a technique to permit the painting of the overhead and bulkheads of the cargo tanks without the use of solid staging through the device of multiple, permanent padeye openings in the overhead, thereby permitting the operations of sandblasting, cleaning and painting the cargo tank while cables are left hanging. The "drop change" is the movement of the Climber from one pair of cables to another, together with the attachment of the supporting cables to the suspending cable, thereby permitting the Climber to move up and down on its own cables. When performed by a painting or laborer crew, it may require 15 to 20 minutes, whereas an original installation may require a full day if performed by a carpenter or shipwright crew as members of the Carpenters Union. After the Climber has been initially installed by shipwrights, the customary procedure for the performance of work in a cargo tank is sandblasting (the Painters Union), followed by cleaning in preparation for painting (the Laborers Union), after which preservative paint is applied (the Painters Union). Since protective clothing and gear are required for sandblasting and painting, it follows that if "drop changes" were to be made by Carpenters the shipwrights would be required to change into and out of protective clothing several times each day, or otherwise remain idle while the Painters did their sandblasting and painting and the Laborers did their cleaning in preparation for the painting. Similarly, the employer's written procedure for use of suspended power platforms states that sandblast and paint supervisors are responsible for and must be present for any change of rigging on suspended work platforms required for blasting and painting. Clearly, as a time and cost-saving device, the use of Painters and Laborers was far more advantageous, but from a brief historical standpoint the Carpenters have always had assigned the rigging of the Climbers.[4]
 The jurisdictional dispute went to arbitration on January 11, 1977 with the Carpenters, Painters and Laborers each being represented[5] and, at the outset of the hearing, the arbitrator noted the agreement as to procedures and the fact that his decision would be final and binding upon the Unions. After receiving an adverse decision on March 23, 1977, Carpenters made no motion to vacate or set aside the award but, after demanding that FMC submit the matter to arbitration under its Collective Bargaining Agreement, filed this § 301 action on August 31, 1977.
 * Since the argument of this case, the Supreme Court has decided United Parcel Service, Inc. v. Mitchell, --- U.S. ----, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981). In substance, it covers essentially every point raised by appellant. After an employee of United Parcel Service was discharged for dishonest acts, the employee requested his union to file a grievance which, in turn, went before a panel consisting of three union and three company representatives. The Joint Panel upheld the discharge and, pursuant to the collective-bargaining agreement, the decision was "binding on all parties." Seventeen months later the employee filed his complaint against his union and the United Parcel Service under § 301(a) of the Labor Management Relations Act. The employer and the union moved for summary judgment alleging that the action was time-barred by reason of New York's ninety day statute of limitations to vacate arbitration awards which provides that "An application to vacate or modify an (arbitration) award may be made by a party within ninety days after its delivery to him."
 The District Court in Mitchell granted summary judgment to the defendant, but the Court of Appeals reversed, holding that the District Court should have applied New York's six year limitations period for breach of contract, and further held that the six year period provided "for relatively rapid disposition of labor disputes without undermining an employee's ability to vindicate his rights through § 301 actions."
 The Supreme Court reversed, holding that (1) the § 301 action was the full equivalent of an action to vacate the award of the Joint Panel and distinguishing Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976), strenuously urged by the appellant herein, (2) borrowing the state limitations period for actions to vacate arbitration awards was proper, (3) any grievance process "cannot be expected to be error-free" and (4) the indispensable predicate for a § 301(a) action is not a showing under traditional contract law that the discharge was a breach of the collective-bargaining agreement but instead a demonstration that the union breached its duty of fair representation a fact which does not exist in the instant case as Carpenters handled the arbitration proceeding and assuredly does not allege that it failed to perform its duty of fair representation.
 The Supreme Court did not expressly hold that the Federal Arbitration Act, 9 U.S.C. § 12 (1976), applied, but analogized its adoption of the shorter period for actions to vacate an arbitration award by pointing out the importance of early action pursuant to the grievance procedure established by collective-bargaining agreements, and suggesting the difficulties which would necessarily arise by reason of potentially conflicting decisions of arbitrators. As Justice Rehnquist stated: "Given the choices present here, and the undesirability of the results of the grievance and arbitral process being suspended in limbo for long periods, we think the District Court was correct when it chose the 90-day period imposed by New York for the bringing of an action to vacate an arbitration award."[6]
 Oregon has enacted a general commercial arbitration statute, ORS 33.210,[7] which expressly excludes "conditions of employment under collective bargaining contracts." Oregon has also provided, ORS 33.310, that, upon the filing of the award and service or delivery of a copy to the interested parties, "If no exceptions are filed against the same (the award) within 20 days after such service, judgment shall be entered as upon the verdict of a jury." If, after judgment following exceptions an appeal is taken, such appeal must be filed within thirty (30) days after the entry of the judgment appealed from. ORS 19.026 and ORS 33.340. Thus, the time limitation for contesting an award of arbitration in Oregon is necessarily restricted and appreciably less than the approximate 160 days consumed by Carpenters before failing its action under § 301(a).
 It is true, of course, that Oregon's general commercial arbitration statute could not be considered if the collective bargaining contracts provided a specific period within which proceedings to vacate arbitration awards would have to be instituted. In our opinion this was the reason why Oregon's legislative body excluded "conditions of employment under collective bargaining contracts." There is some doubt in our minds that "conditions of employment" include jurisdictional disputes between unions but, assuming arguendo that jurisdictional disputes may be considered as a condition of employment, we see no reason why the 20 day period invoked by ORS 33.310 should not be adopted as a guide for a limitation period to vacate an award of an arbitrator in a jurisdictional labor dispute. In our view the "most appropriate one (limitations period) provided by state law", Johnson v. Railway Express Agency, 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975), is the 20 day period even though, admittedly, the time period is short. However, when we consider that the various collective bargaining agreements specifically limit all grievance procedural steps to periods even less than 20 days, we cannot say that a 20 day time limit to move to vacate an award is a deprivation of a right of due process of law. Our only alternative, under Oregon law, would be to borrow the 6 year statute under ORS 12.080(1) (an action on a contract) or ORS 12.080(2), (an action on liability created by statute), the contract action having been specifically rejected in Mitchell in the absence of a definitive statute fixing 6 years for challenges to awards in arbitration proceedings. Unlike Barrentine v. Arkansas-Best Freight System, --- U.S. ----, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), Carpenters' claim is not related to a statute designed to provide minimum substantive guarantees to individual workers as under the Fair Labor Standards Act, and the Oregon statute providing for an action on liability created by statute is inapposite.
 We note the reluctance of the Supreme Court to hold that the Federal Arbitration Act, 9 U.S.C. § 1, et seq., is applicable to arbitration proceedings involving labor disputes, even though interstate or foreign commerce is present. Presumably, this is because of the wording of 9 U.S.C. § 1 which, after defining "maritime transactions" and "commerce" states: "but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." (Emphasis supplied). In Textile Workers v. Lincoln Mills, 353 U.S. 448, 466, 77 S.Ct. 912, 926, 1 L.Ed.2d 972 (1957), Justice Frankfurter in his dissent expressly put his finger on the issue by saying:
 
 
 1
 If an Act that authorizes the federal courts to enforce arbitration provisions in contracts generally, but specifically denies authority to decree that remedy for "contracts of employment", were available, the Court would hardly spin such power out of the empty darkness of § 301. I would make this rejection explicit, recognizing that when Congress passed legislation to enable arbitration agreements to be enforced by the federal courts, it saw fit to exclude this remedy with respect to labor contracts.
 
 
 2
 Lincoln Mills was an action by a union to require an employer to arbitrate pursuant to the terms of a collective bargaining agreement.[8] As Justice Frankfurter noted in his dissent "the court glaringly ignores the Arbitration Act," id. at 467, 77 S.Ct. at 926. It is true that the majority opinion does not mention the United States Arbitration Act (Federal Arbitration Act), but merely limited its comments to hold that § 301 granted jurisdiction to enforce such arbitration agreements on behalf of or against labor organizations, by also stating that "Congress adopted a policy which placed sanctions behind agreements to arbitrate grievance disputes, by implication rejecting the common-law rule, discussed in Red Cross Line v. Atlantic Fruit Co., 264 U.S. 109 (44 S.Ct. 274, 68 L.Ed. 582), against enforcement of executory agreements to arbitrate."[9]
 
 
 3
 There is additional reasoning pointing to the reluctance of the Supreme Court in fully accepting the Federal Arbitration Act on the issue of timeliness. In Hines v. Anchor Motor Freight, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976), cited and discussed in Mitchell, supra, the issue of timeliness[10] was not raised by the employees, Hines and others, who were aggrieved by the decision of the joint area committee in the grievance process. Approximately two years after the decision upholding the discharge of the employees, the employees, having ascertained that the dishonest acts were attributable to a motel clerk, brought an action under § 301 against the employer and the union, the latter having been charged with the duty of fair representation of the employees. The Court of Appeals reversed the summary judgment in favor of the union, but upheld same in favor of the employer, Anchor. The Supreme Court reversed as to Anchor holding that a union's breach of duty as to fair representation relieves the employee of an express or implied requirement that disputes be settled through contractual grievance procedures and, if it seriously undermines the integrity of the arbitral process, the union's breach also removes the bar of the finality provisions of the contract. In the present case, we have nothing which suggests that the rule in Hines v. Anchor Motor Freight, supra, should be applicable.
 
 
 4
 A similar issue arose in Chauffeurs, Teamsters, etc. v. Jefferson Trucking, 628 F.2d 1023 (7th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 942, 67 L.Ed.2d 111 (1981), where a discharged employee of a trucking company was ordered reinstated to employment with full seniority and back pay, pursuant to the decision of the Joint Grievance Committee under the collective bargaining agreement. The employer made no effort to move to vacate the award. When the employer refused to recognize the award, the employee's union filed an action to enforce the arbitration award. The employer then alleged affirmative defenses to the enforcement of the award. The trial court, and on appeal the Seventh Circuit, struck the affirmative defenses as being belated defenses which should have been asserted in a timely motion to vacate, modify or correct the award. The Court considered the United States Arbitration Act and noted that there was a division among the circuit courts of appeals as to its applicability in light of 9 U.S.C. § 1. However, perhaps anticipating Mitchell, the Seventh Circuit applied the Indiana statute providing for ninety days within which to file a motion to vacate an award. The opinion cites with apparent approval the case of Pizzuto v. Hall's Motor Transit Co., 409 F.Supp. 427 (E.D.Va.1976), which borrowed the three month limitation period prescribed in the Federal Arbitration Act in view of the fact that the Fourth Circuit had expressly excluded arbitration in "contracts of employment of ... (any) class of workers engaged in foreign or interstate commerce."[11] While we do not rely upon Pizzuto, it is interesting that footnote 5 in Mitchell makes reference to the limitation period under the Federal Arbitration Act, 9 U.S.C. § 12 (1976), and further points out that in 42 states with specific limitation periods, 28 have a period of 90 days, 9 have shorter periods, 2 longer, and 3 states have periods based on the term of court.
 
 
 5
 It may be argued that the Oregon statute could not be borrowed because Carpenters could not bring a direct suit to vacate the arbitration award. Mitchell answers this proposition in footnote 3 by saying that a § 301 claim, which if successful would have the same effect, is "closely analogous" to such an action.
 
 
 6
 Recognizing that a twenty-day period for filing a § 301 claim is a relatively short period, we continue our discussion of the matter in the belief that the defendants' motions to dismiss the complaint should have been granted under Rule 12(b)(6), F.R.Civ.P.
 
 II
 
 7
 Carpenters emphasizes the language of Justice Douglas in United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960), where, in speaking of the arbitrator's function, he states that the arbitrator "is confined to interpretation and application of the collective bargaining agreement" and his "award is legitimate only so long as it draws its essence from the collective bargaining agreement." The only issue raised by Carpenters on this point is that the arbitrator found that the "drop changes" were first performed by the shipwrights (carpenters union), that a memorandum was issued by FMC that the former procedure was impractical "which in effect reassigned the work to Defendant Laborers and Painters." The trial court found it unnecessary to reach this issue.
 
 
 8
 We cannot agree that the arbitrator failed to draw the essence of his award from the collective bargaining agreements. A clearer illustration of a jurisdictional dispute cannot be presented. It was Carpenters who filed the grievance following FMC's November 1975 memorandum that it was impracticable for the shipwrights to handle the "drop changes" under the new procedure. For a very brief period in late 1974 and early 1975, the shipwrights had handled the "drop changes", but in the spring or early summer of 1975 the shipwrights' leadman found that he was having difficulty locating shipwrights who could make the changes as required by the sandblasters, painters and laborers, and the leadman agreed that this work could be taken over by the painters and laborers. This is the procedure which was then followed until Carpenters filed its grievance in May, 1976, at which time the work was reassigned to the shipwrights and, after two days of a weekend, it was taken over by the sandblast, painters' and laborers' crews. As the arbitrator noted, the earlier statement from FMC (prior to the May, 1976 grievance) merely provided that "only Carpenters would be allowed to rig and maintain such platforms", but that statement did not define what constituted "rigging or maintaining." Stated otherwise, while it is conceded that the shipwrights have the responsibility for the location, erection, or dismantling of any type of staging, including Albina Climbers, it does not necessarily follow that a new procedure involving a "drop change" must automatically be performed by Carpenters.
 
 
 9
 It should be noted that the award did not specifically assign the "drop changes" to the Painters and Laborers. Neither the decision nor the award made this assignment. The most that it did is to make an award "that the United Brotherhood of Carpenters and Joiners of America is not entitled to have assigned to employees whom it represents the work of making drop changes of Albina Climbers in the cargo tanks of vessels constructed by FMC Corporation at its Portland, Oregon, shipyard."
 
 
 10
 Carpenters alleges and concedes that the Jurisdictional Policy of the Metal Trades Department, AFL-CIO, was the controlling document under which the arbitration proceedings were conducted. Carpenters makes no attack upon the procedures used in selecting the referee (arbitrator) and, in any event, paragraph 4 of the Policy provides:
 
 
 11
 Regardless of method of selection, the referee's decision shall be binding upon all parties concerned unless or until a change is made as hereinafter provided.
 
 
 12
 Examining the Jurisdictional Policy touching jurisdictional disputes, we note that the collective bargaining agreements, in effect, are merely "no-strike" clauses to prevent work stoppages. As stated in paragraph 5 of the Policy, "no decision rendered as provided in Sections 3 and 4 above will prevent the International Unions involved from continuing negotiations for the purpose of effectuating a permanent settlement of the work which may be involved in dispute; nor will any of the decisions above referred to be used by any International Union to justify its permanent claim to the work involved." Thus, as we construe the award, it effectively precludes a work stoppage pending any permanent settlement by the International Unions involved.
 
 
 13
 Paragraph 6 of the Policy does state that employers shall refrain from transferring any work from one craft to another without the full and complete agreement of the crafts directly involved, and further imposes upon the employers the duty to avoid the creation of jurisdictional disputes by "arbitrarily" changing work from one craft to another whether by their own action or by the request of some particular craft. The arbitrator fully discusses the problem, giving the history of the new procedural change occasioned by "drop changes," and pointing out that at least on one occasion the shipwrights' leadman had agreed to the "drop changes" being made by the Painters and Laborers because of his inability to locate shipwrights capable of doing this work at the time and place required. We cannot find that the action by FMC was in any manner arbitrary, especially since FMC's prior statement did not define "rigging or maintaining" when the work was assigned to Carpenters prior to the invocation of the "drop changes" procedure.
 
 
 14
 Probably the clearest example of an arbitration award which failed to draw its essence from the collective bargaining agreements is International Brotherhood of Teamsters, etc. v. W.Pa. Motor Carriers Assoc., 574 F.2d 783 (3d Cir. 1978), where a dispute arose between the Motor Carriers Association and the Teamsters Local 249 with respect to "spotting" in Allegheny County, Pennsylvania. "Spotting" was described as a carrier instructing a driver to leave his trailer at a specified location, and not to remain with it during loading or unloading, thereby permitting the driver to be assigned other duties. In the collective bargaining agreement "spotting" was permitted except in Allegheny County, and this arrangement had existed since 1958. The collective bargaining agreement contained a Maintenance of Standards Clause which provided that said clause would not apply "to inadvertent or bona fide errors made by the Employers or the Union in applying the terms of conditions of this Agreement if such error is corrected within ninety (90) days from the date of the error," and further provided that "a request for relief from such error may be filed in writing with the appropriate Conference Area Committee." After the "spotting" restriction in Allegheny County had been in effect about seven years, the Association requested the Eastern Conference Joint Area Committee (ECJAC) to grant relief from the "spotting" restrictions. The Union protested the jurisdiction of the ECJAC, but the Committee took jurisdiction over the dispute and finally rendered its decision which eliminated all restrictions on "spotting" in Allegheny County. The Union then brought an action under § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), seeking to have the award set aside as it did not draw its essence from the collective bargaining agreement. The Third Circuit, in vacating the award, stated that "The award will not be disturbed unless it can in no rational way be derived from the agreement or unless there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop," and held that the controversy was not arbitrable as the parties had not agreed to submit the dispute to arbitration.[12]
 
 
 15
 In a recent case, F. W. Woolworth Co. v. Miscellaneous Warehousemen's Union, etc., 629 F.2d 1204 (7th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 2016, 68 L.Ed.2d 324 (1981), a divided court found that the arbitration award "drew its essence" from the parties' agreement, viewed in the light of its language, the surrounding circumstances and the "law of the shop" because the provisions of the agreement were somewhat contradictory, thus making it appropriate for the arbitrator to interpret them and resolve the ambiguity. In that case three employees were discharged for absenteeism when they failed to telephone the employer in accordance with the company rules. The arbitrator found a "technical violation" by the employees, but reduced the discharges to suspensions and ordered backpay except for the suspension periods. In a later proceeding by Woolworth to vacate the award under § 301, summary judgment was granted to Woolworth and the award was vacated. On appeal by the intervening employees (the Union having elected not to appeal), the court reversed and, citing United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960), held that the lower court had no business overruling the arbitrator because the court's interpretation of the contract was different from that of the arbitrator. The key question was whether the arbitrator's interpretation could, in some rational manner, be derived from the collective bargaining agreement, viewed in the light of its language, its content, and any other indicia of the parties' intention. The Seventh Circuit further stated that "only when there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award," and the correctness of the arbitrator's conclusion as well as the propriety of his reasoning is not relevant to a reviewing court so long as the award complies with these standards.
 
 
 16
 The precise terms of the reference to arbitration are not revealed by the record, nor does Carpenters allege same. It would appear that, although the arbitrator was not required to give his reasons for his award, he did so in a complete decision. What Carpenters now contends is not that the award failed to draw its essence from the agreement, but that the award was erroneous because of the initial "drop changes" procedure had been assigned to Carpenters. All parties knew that was the situation; there would have been no need for an award if this was the only finding to be made by the arbitrator. In light of the broad discretion vested in the arbitrator and the absence of any proof of language in the submission, the arbitrator had a perfect right to exercise his latitude of judgment and decide the issue as stated in the award. Lynchburg Foundry Company v. United Steelworkers, 404 F.2d 259, 261 (4th Cir. 1968).
 
 
 17
 In our case it was Carpenters who filed the grievance and, consistent with its collective bargaining agreement with FMC, had agreed that the dispute would be settled by the unions involved. Carpenters thereafter agreed to the settlement of the dispute in accordance with the Jurisdictional Policy of the Metal Trades Department and further agreed, at the commencement of the hearing before the arbitrator, that jurisdiction to settle the dispute was vested in the arbitrator.[13] Bearing in mind that the scope of the collective bargaining agreement between Carpenters and FMC specifically provided for the settlement of jurisdictional disputes by the unions, and the fact that there was at least some ambiguity as to the meaning of the term "rigging or maintaining" in light of the new procedure involving "drop changes", it ill behooves Carpenters to now complain that the award did not draw its essence from the collective bargaining agreement. We conclude that the controversy was intended to be within the scope of the arbitration clauses of both collective bargaining agreements here presented. The nature and substance of the arbitrator's decision adequately demonstrated that it was drawn from the essence of these bargaining agreements.
 
 III
 
 18
 Having concluded that the essence of the award was drawn from the collective bargaining agreements, we have nothing left in this case other than Carpenters' desire to vacate the award solely for the purpose of having the matter again submitted to arbitration in the hope that another arbitrator will render a contrary decision, despite the fact that the three unions had agreed that the first arbitrator's decision would be final and binding. We cannot sanction such a procedure and, under the teaching in Mitchell, we must treat this § 301(a) action as a suit to vacate the award of arbitration. Such being the case, there must exist appropriate grounds for vacating the award. Aside from the allegation that the essence of the award was not drawn from the collective bargaining agreements, the complaint alleges no basis upon which relief could be granted and would be grounds for dismissal under Rule 12(b)(6). Under ORS 33.320, the basis for exceptions to an award[14] closely parallels the grounds for vacating an award under the Federal Arbitration Act, 9 U.S.C. § 10. The same grounds are set forth under the Uniform Arbitration Act, 5 Am.Jur.2d, Arbitration and Award, at 168, p. 645; Uniform Arbitration Act § 12, which also provides that notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered. Since grounds for relief against the award do not clearly and unmistakably appear in Carpenters' complaint, it is subject to a Rule 12(b)(6) dismissal.[15] While Carpenters, not having been a signator to the Pacific Coast Master Agreement, perhaps could have declined arbitration in the first instance, it is too late for Carpenters to complain after having voluntarily agreed to arbitrate and having participated therein without objection. As stated in 5 Am.Jur.2d, Arbitration and Award, § 22, p. 537, "The right of the third party to an independent determination may be lost by waiver or estoppel, however, if he consents to, and participates in, arbitration proceedings that affect his own rights and liabilities."
 
 
 19
 Since the complaint, with attached exhibits, fully states the case, and since we must decline the invitation to again permit arbitration for the sole purpose of possibly obtaining a conflicting award, Carpenters has failed to state a case on which any relief can be granted.
 
 
 20
 AFFIRMED.
 
 
 21
 CANBY, Circuit Judge, concurring.
 
 
 22
 I concur totally with the introduction and Part I of Judge Hoffman's opinion, which establish clearly that the present action is barred by limitations. Since the district court did not reach the question whether the arbitrator's decision drew its essence from the collective bargaining agreement, I would not rule upon it here.
 
 
 
 *
 Honorable Walter E. Hoffman, Senior United States District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 Essentially all proceedings were before the United States Magistrate whose findings and recommendation were adopted by the District Court
 
 
 [2]
 The statute, in pertinent part, provides:
 (a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
 C, Painters and Laborers, but apparently not Carpenters, were signators to the Pacific Coast Master Agreement, which provides under Article 24, § 24.1:
 
 
 [3]
 There are other uses of the Climber which are not in controversy, this dispute being limited to the "drop changes" on work performed within the cargo tanks
 
 
 [4]
 The historical background is not of long duration. The first ocean-going tanker built by FMC was launched in April, 1974, but it did not require the painting of the interiors of the cargo tanks. The first vessel requiring interior painting was the Chevron Washington at which time the work of the "drop changes" was performed by Carpenters. In November, 1975, the employer issued a memorandum as its earlier memo had not defined what constituted "rigging or maintaining", and stated that the procedure was impracticable
 
 
 [5]
 The employer, FMC, was not a party to the arbitration, although its representative did act as an observer. Obviously FMC was interested in the outcome but the jurisdictional dispute was solely between the Unions
 
 
 [6]
 In dissent, Justice Stewart would impose the six months limitation of § 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b). As in the present case, the applicability of § 10(b) was never pressed and only casually mentioned by the majority, although Justice Blackmun indicated a possible agreement with Justice Stewart upon the presentation of a full adversarial record, and Justice Stevens expressed the view that § 10(b) could perhaps be applied to a claim against the union, but not against an employer who is not accused of an unfair labor practice
 
 
 [7]
 O.R.S. 33.210 provides: "All persons desiring to settle by arbitration any controversy, suit or quarrel, except such as respect the title to real estate or the terms or conditions of employment under collective contracts between employers and employees or between employers and associations of employees, may submit their differences to the award or umpirage of any person or persons mutually selected."
 
 
 [8]
 We do not question the jurisdiction of the district court to entertain an action under § 301. As stated by Justice Douglas in Lincoln Mills, id. at 455, 77 S.Ct. at 917, § 301 "expresses a federal policy that federal courts should enforce these (arbitration) agreements on behalf of or against labor organizations and that industrial peace can be best obtained only in that way." (Emphasis supplied). There was no need for Painters and Laborers, or either of them, to bring an action against FMC to enforce the arbitration agreement in question as the three unions had not only agreed to arbitration but also went through the entire proceeding and agreed to be bound by the decision. Moreover, FMC immediately abided by the award
 
 
 [9]
 The present case, of course, does not involve an executory agreement. It had already been arbitrated and a decision rendered
 
 
 [10]
 Justice Rehnquist, with The Chief Justice joining, dissented and only casually touches on the issue of timeliness by saying: "The federal statute governing arbitration, 9 U.S.C., §§ 1-14 provides similarly narrow grounds for vacating an award. § 10." 424 U.S. at 575, 96 S.Ct. at 1061
 However, Mitchell states that Hines v. Anchor Motor Freight "strongly supports borrowing the limitations period for actions to vacate arbitration awards. As Hines makes clear, an employee may go behind a final and binding award under a collective bargaining agreement and seek relief against his employer and union only when he demonstrates that his union's breach of its duty 'seriously undermine(d) the integrity of the arbitral process.' " (Emphasis supplied). Of course, in the present case, we have no allegation that Carpenters, in agreeing and submitting to arbitration, in any manner seriously undermined the integrity of the arbitral process.
 In Sine v. Local 992, etc., 644 F.2d 997 (1981), the Fourth Circuit sustained the borrowing provisions of a Maryland statute imposing a time limitation of 30 days within which to file a petition to vacate an award. The Fourth Circuit did not consider the shortness of time.
 
 
 [11]
 For the purposes of this case, we accept Carpenters allegations that FMC was engaged in interstate commerce in constructing vessels
 
 
 [12]
 In Justice Goldberg's concurring opinion in Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), at pages 352-355, 84 S.Ct. at 373-374, he states that arbitration is not unequivocally tied to the labor contract where the parties, by joint action, modify, amend and supplement their original collective bargaining agreement, and that the parties are free to settle grievances not falling within the scope of the contract. While we do not suggest that the jurisdictional dispute here involved falls outside the scope of the contract, we think it clear that the participating unions in the arbitration proceedings were fully cognizant of what the arbitrator was to decide
 
 
 [13]
 At the start of the hearing the arbitrator announced:
 "The parties to the proceeding agreed that the requisite procedures had been followed and that the matter was properly brought before the undersigned for decision on the merits. In addition, the parties agreed that the decision of the undersigned should be final and binding upon them."
 There was no dissent registered by the participating unions to this statement.
 
 
 [14]
 ORS 33.320 states the causes for exceptions to an arbitration award as follows:
 (1) The award was procured by corruption, fraud or undue means.
 (2) There was evident partiality or corruption on the part of the arbitrators, or any of them.
 (3) The arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party were prejudiced.
 (4) The arbitrators exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made.
 (5) There was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.
 (6) The arbitrators awarded upon a matter not submitted to them, unless it was a matter not affecting the merits of the decision upon the matters submitted.
 (7) The award was imperfect in matter of form not affecting the merits of the controversy.
 
 
 [15]
 Each defendant or interested party named herein raised the Rule 12(b)(6) defense in their pleadings