Anthony I. CRAFT, Plaintiff–Appellee,

v.

**CAMPBELL SOUP COMPANY,**
Defendant–Appellant.

No. 98–15060.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 10, 1998.

Filed Dec. 2, 1998.

Amended May 27, 1999.

Steven B. Berlin, Littler Mendelson, San Francisco, California, for the defendant-appellant.

John E. Linneball and Gerald Lynn Ross, Ross & Associates, San Francisco, California, for the plaintiff-appellee.

Before: BRUNETTI, TASHIMA, and GRABER, Circuit Judges.

## ORDER

PER CURIAM.

A judge of this court called for en banc review. A vote was taken and a majority of the non-recused active judges did not vote in favor of en banc review. The *sua sponte* call for en banc review is therefore DENIED.

The opinion filed on December 2, 1998, 161 F.3d 1199, is amended in accordance with the amended opinion attached hereto.

## OPINION

We must decide the threshold issue of whether we have jurisdiction to hear Campbell Soup Company's ("Campbell Soup") interlocutory appeal from the district court's denial of its motion for summary judgment. Because we conclude that appellate jurisdiction is lacking, we dismiss the appeal.

As there is no final judgment or any other applicable exception to the final judgment rule, this court has jurisdiction only if the Federal Arbitration Act ("FAA") applies. *See* 9 U.S.C. § 16 (providing for interlocutory appeal under the FAA). Our jurisdiction therefore hinges

on the proper interpretation of the FAA in relation to employment contracts, which is a question of first impression in our circuit. *See Kummetz v. Tech Mold, Inc.*, 152 F.3d 1153, 1155 n. 2 (9th Cir.1998) ("Whether § 1 of the FAA broadly excludes arbitration agreements within contracts of employment is an open question in this circuit.") (citing *Nelson v. Cyprus Bagdad Copper Corp.*, 119 F.3d 756, 759 n. 4 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1511, 140 L.Ed.2d 665 (1998)).

## I.

Anthony I. Craft was an employee of Campbell Soup and a member of the Food Process Workers and Warehousemen and Helpers Local Union 228 ("Union"). The collective bargaining agreement ("CBA") between Campbell Soup and the Union includes a nondiscrimination clause which provides in part that "[d]isputes under this provision shall be subject to the grievance and arbitration procedure [provided in the CBA]." [1]

Craft filed a grievance alleging racial discrimination, harassment, health and safety concerns, and other claims. The grievance was not resolved in the initial grievance stages and the Union referred it to arbitration. While the grievance was still pending, Craft filed this action in district court. He alleged claims for race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and state law claims for assault and emotional distress.[2]

The district court granted Campbell Soup summary judgment on Craft's state law claims. Following the majority view, however, the court held that arbitration of Craft's Title VII claims could not be compelled.[3] Accordingly, it denied Campbell Soup's summary judgment motion as to those claims. Campbell Soup appeals that interlocutory order denying its motion for summary judgment on Craft's Title VII claims.[4]

## II.

### A.

"When interpreting a statute, this court looks first to the words that Congress used." *Sanchez v. Pacific Powder Co.*, 147 F.3d 1097, 1099 (9th Cir.1998). "Rather than focusing just on the word or

---

1. The nondiscrimination clause provides:

   The Company and the Union do not and will not discriminate against employees because of race, color, religion, sex, age, or national origin. The Company offers equal employment, transfer and promotional opportunities regardless of race, color, religion, sex, age or national origin. All employment practices are to be conducted in nondiscriminatory manner, all hiring, promotion practices, and other terms and conditions of employment shall be maintained and conducted in a manner which does not discriminate on the basis of race, color, sex, religion, national origin, handicap or service in the Armed Forces in accordance with applicable Federal and State laws. Disputes under this provision shall be subject to the grievance and arbitration procedure.
   CBA, ¶ 26.1.

2. At the arbitration, the arbitrator was concerned about the parallel judicial and arbitral proceedings and correctly noted a circuit split on his authority to resolve Craft's race discrimination claims. Ultimately, the arbitrator decided that Craft's claims under the CBA were so intertwined that the Union had to submit the entire grievance to arbitration or withdraw it.

3. *See Doyle v. Raley's, Inc.*, 158 F.3d 1012, 1015 n. 3 (9th Cir.1998) (gathering cases and noting circuit split). In *Wright v. Universal Maritime Serv. Corp.*, —— U.S. ——, ——, —— n. 1, 119 S.Ct. 391, 392–93, 395 n. 1, 142 L.Ed.2d 361 (1998), the Supreme Court declined to consider the applicability of the FAA in a case which presented "the question whether a general arbitration clause in a collective-bargaining agreement (CBA) requires an employee to use the arbitration procedure for an alleged violation of the Americans with Disabilities Act of 1990(ADA), 104 Stat. 327, 42 U.S.C. § 12101 *et seq.*"

4. Both parties assume that Campbell Soup's motion for summary judgment was a *de facto* petition under 9 U.S.C. § 4 for an order to compel arbitration. Although Campbell Soup's motion does not mention this section, we agree that it was functionally equivalent to a motion to compel arbitration.

phrase at issue, this court looks to the entire statute to determine Congressional intent." *Id.* Applying those principles here, we begin with § 2 of the FAA, which provides for the enforcement of certain arbitration provisions:

A written provision in any maritime transaction or a *contract evidencing a transaction involving commerce* to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (emphasis added).

The FAA does not define the phrase "contract evidencing a transaction involving commerce," so we turn to the "ordinary, contemporary and common meaning" of that phrase. *See United States v. Iverson,* 162 F.3d 1015, 1022 (9th Cir.1998). A collective bargaining agreement or an individual employment contract would not seem to fall within the ordinary concept of a contract "evidencing a transaction," even if it involves interstate commerce.

As pertinent, when Congress passed the FAA in 1925, the term "transaction" commonly meant "[a] business deal; an act involving buying and selling." *Webster's Int'l Dictionary* 2688 (2d ed. unabridged 1939). *See also The Century Dictionary and Cyclopedia* 6426 (revised and enlarged ed.1911) ("1. The management or settlement of an affair; a doing or performing: as, the *transaction* of business. –2. A completed or settled matter or item of business . . . ." ). An employment relationship, however, is not commonly referred to as a "business deal" or as "an act involving buying and selling." Instead, the connotation of the phrase "transaction involving commerce"—as Congress would have un-

derstood it in 1925—was of a commercial deal or merchant's sale. Therefore, the coverage section of the FAA, § 2, appears not to encompass employment contracts at all. *See* Archibald Cox, *Grievance Arbitration in the Federal Courts,* 67 Harv. L.Rev. 591, 599 (1954) ("It is hard enough to think of any collective bargaining agreement or employment contract as evidence of a transaction involving commerce.") (internal quotation marks omitted); Henry H. Drummonds, *The Sister Sovereign States: Preemption and the Second Twentieth Century Revolution in the Law of the American Workplace,* 62 Fordham L.Rev. 469, 557 (1993) ("[T]he FAA's reference to 'transaction involving commerce' might not have been understood in 1924 as including employment contracts.").

Section 1 of the FAA, however, contains definitions and, with respect to "commerce," concludes that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. This latter provision might suggest that Congress intended for § 2 to apply to some collective bargaining agreements and employment contracts. Viewed as a whole, the statute is ambiguous.

Courts have developed two interpretations of these provisions: (1) Congress did not intend for the FAA to apply to any employment contracts; and (2) Congress intended for the FAA to apply to all employment contracts, except for the contracts of employees who actually transport people or goods in interstate commerce. Craft does not actually transport people or goods in interstate commerce. Thus, if the latter view applies, the FAA governs this action, and we have jurisdiction to decide this appeal. If, on the other hand, the FAA does not apply to employment contracts, then the FAA's interlocutory appeal provision, 9 U.S.C. § 16(a)(1)(B), would not give us jurisdiction to decide this appeal.[5]

---

5. Campbell Soup argues that § 2 of the FAA contains a broad policy favoring arbitration.

Thus, interpreting the FAA to exclude employ-

## B.

Courts that have adopted the latter view have relied on a contemporary understanding of the terms used in the FAA.[6] The FAA, however, is not a modern statute. As noted above, the FAA, including §§ 1 and 2, was enacted in 1925, before the Supreme Court dramatically expanded the meaning of interstate commerce in the 1930s. Thus, to understand whether Congress intended for the FAA to apply to employment contracts, we need to understand Congress' commerce power in 1925.

Before Congress enacted the FAA, the Supreme Court decided *Hammer v. Dagenhart,* 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101 (1918), *overruled by United States v. Darby,* 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941). In *Hammer,* the Court invalidated a federal child labor law, holding that Congress' commerce power did not extend to intrastate employees whose work involved interstate commerce. *Hammer* defined the scope of the Commerce Clause as quite limited:

> Commerce consists of intercourse and traffic ... and includes the transportation of persons and property, as well as the purchase, sale and exchange of commodities. The making of goods and the mining of coal are not commerce, nor does the fact that these things are to be afterwards shipped or used in interstate commerce, make their production a part thereof.
>
> Over interstate transportation, or its incidents, the regulatory power of Congress is ample, but the production of articles, intended for interstate commerce, is a matter of local regulation.

*Id.* at 272, 38 S.Ct. 529 (citation and internal quotation marks omitted). Similarly, in *Howard v. Illinois Cent. R.R.,* 207 U.S. 463, 28 S.Ct. 141, 52 L.Ed. 297 (1908) (the first employer liability case), employees not directly working in interstate commerce were deemed outside of Congress' Commerce Clause power. *Howard* rejected the idea that "one who engages in interstate commerce thereby submits all his business concerns to the regulating power of Congress," *id.* at 502, 28 S.Ct. 141, and held the employer liability act unconstitutional, because it included subjects outside of Congress' constitutional power to regulate, *id.* at 504, 28 S.Ct. 141.

This narrow understanding of Congress' Commerce Clause power continued through the period of the drafting and enacting of the FAA. In *United Leather Workers' Int'l Union v. Herkert & Meisel Trunk Co.,* 265 U.S. 457, 464–65, 44 S.Ct.

---

ment contracts would conflict with that policy. However, the argument is circular; the very question to be answered is whether § 2 and its broad policy apply to employment contracts at all. *See Perry v. Thomas,* 482 U.S. 483, 489, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987) ("Section 2, therefore, embodies a clear federal policy of requiring arbitration *unless* the agreement to arbitrate is not part of a contract" satisfying the requirements of that section.) (emphasis added). We decline to bootstrap a policy argument to expand the scope of § 2.

6. The majority of circuits have interpreted the FAA to apply to all employment contracts, except for the contracts of employees who actually transport people or goods in interstate commerce. *See McWilliams v. Logicon, Inc.,* 143 F.3d 573, 576 (10th Cir.1998) (ignoring conflicting precedent in *United Food Workers, Local Union No. 7R v. Safeway Stores, Inc.,* 889 F.2d 940, 943–44 (10th Cir. 1989)); *O'Neil v. Hilton Head Hosp.,* 115 F.3d 272, 274 (4th Cir.1997) (ignoring conflicting precedent in *Domino Sugar Corp. v. Sugar Workers Local Union 392,* 10 F.3d 1064, 1067–68 (4th Cir.1993)); *Pryner v. Tractor Supply Co.,* 109 F.3d 354, 356–58 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 295, 139 L.Ed.2d 227 (1997); *Cole v. Burns Int'l Sec. Serv.,* 105 F.3d 1465, 1470–72 (D.C.Cir.1997); *Rojas v. TK Communications, Inc.,* 87 F.3d 745, 747–48 (5th Cir.1996); *Asplundh Tree Expert Co. v. Bates,* 71 F.3d 592, 596–601 (6th Cir.1995); *Erving v. Virginia Squires Basketball Club,* 468 F.2d 1064, 1069 (2d Cir.1972); *Dickstein v. duPont,* 443 F.2d 783, 785 (1st Cir.1971); *Tenney Eng'g, Inc. v. United Elec. Workers, Local 437,* 207 F.2d 450, 452–53 (3d Cir.1953). A few courts, however, have held that the FAA does not apply to any employment contracts. *See Domino Sugar Corp.,* 10 F.3d at 1067–68; *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 7 F.3d 1110, 1120 (3d Cir.1993) (ignoring conflicting Third Circuit precedent in *Tenney* ); *United Food Workers,* 889 F.2d at 943–44.

623, 68 L.Ed. 1104 (1924), the Court held that an illegal strike of leather workers preventing the manufacture of goods did not interfere with interstate commerce, as it did not interfere with the "free transport and delivery of the products." Thus, Congress' Commerce Clause power at the time of the FAA's enactment was limited to employees who actually transported people or goods in interstate commerce.

Under these circumstances, when Congress drafted § 2, that section could only apply to those employees. Section 1, however, exempts those very same employees from the scope of the FAA. Thus, when Congress drafted the FAA in 1925, the Act did not apply to any labor or employment contracts. *See Arce v. Cotton Club of Greenville, Inc.*, 883 F.Supp. 117, 123 (N.D.Miss.1995) ("[I]nterstate commerce at the time the FAA was enacted was generally understood to be limited to maritime and railroad transactions. Thus, when Congress excluded employment contracts of maritime and railroad workers, it

resulted in voiding the power to enforce arbitration clauses of most employment contracts. With the addition of the catch-all phrase 'or any other class of worker engaged in foreign or interstate commerce,' *all employment contracts would have been excluded from the arbitration enforcement power of the FAA.*") (emphasis added). *See also* Matthew W. Finkin, *Employment Contracts Under the FAA—Reconsidered,* 48 Labor L.J. 329, 334 (1997) ("[W]hen the Act was passed in 1925, Congress excluded all contracts of employment over which it then had jurisdiction.").[7]

Moreover, these are not mere theoretical musings, as demonstrated (for example) by the court's decision in *San Carlo Opera Co. v. Conley,* 72 F.Supp. 825 (S.D.N.Y.1946). In *Conley,* an opera singer entered into an employment option contract that included an arbitration clause. *Id.* at 826–27. The singer agreed to work for the employer once he was released from the military. *Id.* at 826. As part of

7. *See also* Sarah Rudolph Cole, *Incentives and Arbitration: The Case Against Enforcement of Executory Arbitration Agreements Between Employers and Employees,* 64 U. Mo. K.C. Rev. 449, 468 (1996) ("[A]t the time the FAA was passed, the language was intended to exclude contracts of employment from its purview."); Cox, 67 Harv. L.Rev. at 598 ("At that time [1924] no one supposed that there was federal power to regulate employment relations in industries producing goods for commerce or industries affecting commerce, and the phrase 'any other class of workers engaged in interstate commerce or foreign commerce' might well have been considered broad enough to reach every contract of employment subject to federal regulation. Consequently, it would seem equally accurate historically and equally permissible textually to read the words either as coextensive with the constitutional power of Congress however defined or else limited to the few types of employment believed subject to federal regulation in 1924."); Finkin, 48 Labor L.J. at 333 ("The reach of Congressional power over employment contracts in 1925 was quite narrow.... In 1925, Congress had no power to legislate regarding contracts of employment of accountants or secretaries even if they worked for railroads or steamship companies, or of deliverymen if they did not cross state lines. It was irrelevant whether or

not the statute dealt with employees 'in' interstate commerce, 'engaged in' interstate commerce or who were 'involved in' interstate commerce, for however the statute was phrased, these employees were wholly outside the power of Congress to regulate at the time and Congress could not have intended to include them."); Donna Meredith Matthews, *Employment Law After Gilmer: Compulsory Arbitration of Statutory Antidiscrimination Rights,* 18 Berkeley J. Emp. & Lab. L. 347, 368 (1997) ("Logically, one could argue that the FAA reaches employment contracts only by way of the Commerce Clause, and that when the FAA was enacted in 1925 commerce was still narrowly defined. Thus, this exclusion clause was intended to assuage concerns by the very employees who might be affected—those engaging in interstate commerce. Because the Commerce Clause did not reach other employment contracts, they were unaffected by the FAA.") (footnote omitted); Jeffrey W. Stempel, *Reconsidering the Employment Contract Exclusion in Section 1 of the Federal Arbitration Act: Correcting the Judiciary's Failure of Statutory Vision,* 1991 J. Disp. Resol. 259, 294 (1991) ("The evidence suggests, however, that the 1925 Congress would have considered all workers subject to the commerce power as within the employment exclusion.").

his contract, the singer would perform throughout the country. *Id.* at 831. Thereafter, a dispute arose and the employee filed an action under the FAA. *Id.* at 827–28. The court, however, held that the FAA did not apply to the contract:

> [P]ersonal effort, not related to production, is not a subject of commerce. That which in its consummation is not commerce does not become commerce among the States because the transportation that we have mentioned takes place.
>
> .   .   .   .   .
>
> Since the contract does not evidence a transaction arising out of interstate or foreign commerce as set forth in Section 2 of the [FAA] this court would have no authority to compel arbitration....

*Id.* at 831–32, *aff'd*, 163 F.2d 310, 311 (2d Cir.1947) (per curiam) ("We have nothing to add to Judge Leibell's discussion of the question of jurisdiction.... We concur.") (citations omitted).

As is evident, the court held that the FAA did not apply to the employment contract *because of § 2's coverage provision* and not because of § 1's exclusion. Of course, today, the opera singer would be within Congress' Commerce Clause power. Thus, the opera singer's contract would be subject to arbitration under the FAA if Campbell Soup's interpretation of the Act is correct.

But Campbell Soup's interpretation of the FAA would require us to hold that Congress intended to *include* some employment contracts within the scope of the FAA *prospectively*, even though it *initially excluded* all employment contracts. That approach attributes to Congress the ability to foresee the New Deal's expansion of the Commerce Clause. We refuse to adopt such an interpretation without any indication that Congress actually had such

a counterintuitive intent. As Professor Epstein has observed:

> The 1925 reading of the commerce clause gave to the phrase "involving commerce" a reading that reached the instrumentalities of interstate commerce, but not retail trades and manufacturing. Because the original coverage was so defined, it was easy to read the tag end of the employee exemption in harmony with the basic coverage provision. The only workers whose contracts were shielded from arbitration were those who plied the narrow paths of interstate and foreign commerce before 1937. Since the FAA itself does not reach manufacturing and retail trades, the exemption is coordinated with the basic provision.
>
> Come the undeniable transformation of 1937, and what should be done to the pre–1937 statute? The phrase "involving commerce" has now been recast to cover all productive activities. The only way to reach this conclusion is to assume that Congress meant for the FAA to grow in scope with the commerce power, even when Congress was quite mistaken (along with everyone else) about its prospects for growth....
>
> .   .   .   .   .
>
> ... But once the FAA is (mistakenly) expanded, what fate befalls its exclusion?
>
> ... Under current law, the right answer is that the FAA keeps to its 1925 contours.... By venturing into the waters of partial translation, both sides to the present dispute get the arguments confused. First they wrongly expand the coverage "involving commerce" to keep the FAA in play; then they give the 1925 exemption its 1925 plain meaning.

Richard A. Epstein, *Fidelity Without Translation*, 1 Green Bag 2d 21, 27–29 (1997).[8]

8. *See also* Robert C. Covington, *Employment Arbitration After Gilmer: Have Labor Courts Come to the United States?*, 15 Hofstra Lab. & Emp. L.J. 345, 364 (1998) ("[T]he choice Congress made in 1925 was to exclude from the scope of the FAA all contracts of employment that they felt would lie within their power to regulate, namely workers engaged in the movement of goods. Viewed in this way, the exclusion from coverage should be interpreted to be as broad as the category of employment contracts within the sphere of Congressional power today.") (footnote omitted);

## C.

To determine whether Congress intended for the FAA to apply prospectively to some labor and employment contracts, even though it did not apply to any at its enactment, we next turn to legislative history. *See Moyle v. Director, Office of Workers' Comp. Programs*, 147 F.3d 1116, 1120 (9th Cir.1998) ("[I]f the statute is ambiguous, we consult the legislative history, to the extent that it is of value, to aid in our interpretation.") (citation and internal quotation marks omitted), *cert. denied,* —— U.S. ——, 119 S.Ct. 1454, 143 L.Ed.2d 541 (1999). We hold that the legislative history supports the conclusion that we have tentatively reached from interpreting (a) the statutory term "transaction" and (b) the scope of Congress' commerce power as understood in 1925.

Specifically, the legislative history demonstrates that the Act's purpose was solely to bind merchants who were involved in commercial dealings. *See Local 205, United Elec. Workers v. General Elec. Co.*, 233 F.2d 85, 99 (1st Cir.1956) (noting that "congressional attention was being directed at the time solely toward the field of commercial arbitration"), *aff'd on other grounds*, 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028 (1957). Before the Senate

Matthew W. Finkin, *"Workers' Contracts" Under the United States Arbitration Act: An Essay in Historical Clarification*, 17 Berkeley J. Emp. & Lab. L. 282, 298 (1996) ("The [FAA] exempts contracts of employment, all contracts of employment, over which Congress had constitutional authority. The scope of the commerce power when the [FAA] was enacted was quite narrow; in the employment setting, it was limited largely to transportation workers. Thus in 1925, the [FAA] could not have applied to an arbitration provision in the employment contract of a neonatal physician, a manufacturing manager, or a secretary in a law firm, because these employees would not have been considered as being in interstate commerce. As the commerce power has been expanded by the United States Supreme Court, the exemption has expanded along with it, leaving the status of employees' contracts in practical effect just as they were when the Act passed. The contrary (though currently prevailing) view produces an anomaly.") (footnotes omitted).

Committee on the Judiciary held hearings on the FAA, the draft bill made valid and enforceable "a written provision in *any contract or* maritime transaction *or* transaction involving commerce to settle by arbitration a controversy thereafter arising."[9] *See, e.g., Sales and Contracts to Sell in Interstate and Foreign Commerce, and Federal Commercial Arbitration, Hearing on S. 4213 and S. 4214 before a Subcomm. of the Senate Comm. on the Judiciary*, 67th Cong. 1 (1923) (emphasis added) ("67th Cong."). *See · also Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 279, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (citing the original wording of the FAA). That draft of the bill thus applied to all contracts and did not contain the employment exclusion later codified in § 1.

At the hearing, the chair of the ABA committee that drafted the bill that became the FAA,[10] W.H.H. Piatt, testified that the bill was partly in reaction to intense judicial hostility toward arbitration of merchants' disputes. 67th Cong. at 8 (1923) (statement of W.H.H. Piatt). Despite that purpose, concern was expressed over whether the bill would apply to workers' contracts. *Id.* Piatt emphasized that the bill was not intended to apply to those contracts:

9. Section 2 of that draft bill provided in full:

That a written provision in any contract or maritime transaction or transaction involving commerce to settle by arbitration a controversy thereafter arising between the parties out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, enforceable, and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract.

S. 4214, 67th Cong. § 2 (1922).

10. The bill that became the FAA was drafted by the ABA Committee on Commerce, Trade and Commercial Law. *See Tenney*, 207 F.2d at 452 & n. 5 (citing H.R.Rep. No. 96, 68th Cong., 1st Sess., p. 1).

It is not intended that this shall be an act referring to labor disputes *at all.* It is purely an act to give the merchants the right or the privilege of sitting down and agreeing with each other as to what their damages are, if they want to do it. Now that is all there is in this. *Id.* at 9 (emphasis added).[11] However, Piatt suggested that, if Congress felt that "there is any danger of that," they could add an employment exclusion. *Id.*

Before that same committee, the Secretary of Commerce, Herbert Hoover, similarly suggested that, if Congress wanted to ensure that "workers' contracts" were excluded from the bill, "it might well be amended by stating 'but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in interstate or foreign commerce.'" *Id.* at 14. Thereafter, Congress amended what became § 2 of the FAA so that it applied only to "contracts evidencing a transaction" (not to all contracts) and added the employment exclusion.

As can be seen from the hearing before the Senate Committee on the Judiciary, as well as from the subsequent amendments that Congress made to the proposed legislation, the FAA was part of an effort to gain uniformity in the application of agreements to arbitrate sales and commercial disputes. Congress never intended for the FAA to apply to employment contracts of any sort. *See Willis v. Dean Witter Reynolds, Inc.,* 948 F.2d 305, 311 (6th Cir.1991) ("A review of the legislative history of the FAA confirms that the FAA was never meant to incorporate employment contracts ...."), *not followed as dictum in Asplundh,* 71 F.3d at 597.[12]

### D.

While neither this court nor the Supreme Court has definitively ruled on whether the FAA applies to labor and employment contracts, both courts have suggested that it does not. In *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 923 (1957), and *General Elec. Co. v. United Elec. Workers,* 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028 (1957), although the Court enforced the arbitration agreements at issue, it did so under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a), and not under the FAA. *See Lincoln Mills,* 353 U.S. at 456; *General Elec.,* 353 U.S. at 548. In dissent, Justice Frankfurter highlighted the importance of that distinction:

> Naturally enough, I find rejection, though not explicit, of the availability of the Federal Arbitration Act to enforce arbitration clauses in collective-bargaining agreements in the silent treatment given that Act by the Court's opinion. If an Act that authorizes the federal courts to enforce arbitration provisions in contracts generally, but specifically denies authority to decree that remedy for "contracts of employment," were available, the Court would hardly spin such power out of the empty darkness of § 301. I would make this rejection explicit, recognizing that when Congress passed legislation to enable arbitration agreements to be enforced by the federal courts, it saw fit to exclude this remedy with respect to labor contracts.

*Lincoln Mills,* 353 U.S. at 466–67, 77 S.Ct. 923 (Frankfurter, J., dissenting).

---

11. Piatt also went out of his way to state that he "would not favor any kind of legislation that would permit the forcing a man to sign that kind of contract.... [I]t is the primary end of this contract [sic: bill] that it is a contract between merchants one with another, buying and selling goods." *Id.* at 10.

12. *See also* Heidi M. Hellekson, *Taking the "Alternative" Out of Dispute Resolution of Title VII Claims: The Implications of a Manda-* *tory Enforcement Scheme of Arbitration Agreements Arising Out of Employment Contracts,* 70 N. Dak. L.Rev. 435, 446 (1994) ("This legislative history indicates that Congress's intent when enacting the FAA was to exclude all employment contracts from the Act's coverage."); Amy L. Ray, *When Employers Litigate to Arbitrate: New Standards of Enforcement for Employer Mandated Arbitration Agreements,* 51 SMU L.Rev. 441, 446–47 (1998) (reaching the same conclusion).

More recently, in *Gilmer v. Inter-state/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), the Court faced an arbitration clause in a New York Stock Exchange securities form. The Court declined to address whether the FAA applied to employment contracts, because the securities agreement was not such a contract. *See id.* at 25 n. 2, 111 S.Ct. 1647. However, the dissent reached that issue and concluded that Congress did not intend for the FAA to apply to employment contracts at all. *See id.* at 39–41, 111 S.Ct. 1647 (Stevens, J., dissenting) ("[T]he FAA specifically was intended to exclude arbitration agreements between employees and employers.").[13]

We have repeatedly noted the Supreme Court's reluctance to hold the FAA applicable to labor disputes. *See Local 1020 of the United Brotherhood of Carpenters & Joiners of Am. v. FMC Corp.*, 658 F.2d 1285, 1290 (9th Cir.1981) ("We note the reluctance of the Supreme Court to hold that the Federal Arbitration Act, 9 U.S.C. § 1, *et. seq.*, is applicable to arbitration proceedings involving labor disputes...."). *See also American Postal Workers Union of Los Angeles, AFL–CIO v. United States Postal Serv.*, 861 F.2d 211, 215 n. 2 (9th Cir.1988) ("Neither the Supreme Court nor this court has ever expressly held the Federal Arbitration Act applicable to arbitration of labor disputes.").

We have also stated our own inclination not to apply the FAA to those disputes. *See Pacific Reinsurance Mgmt. Corp. v.* *Ohio Reinsurance Corp.*, 935 F.2d 1019, 1024 n. 2 (9th Cir.1991) (citing *Misco*, 484 U.S. at 40, 108 S.Ct. 364) (noting, in dictum, that "labor arbitration ... is not covered by the FAA"); *American Postal Workers*, 861 F.2d at 215 (indicating that Congress did not mean the FAA to be used to review arbitration awards involving collective bargaining agreements); *Kemner v. District Council of Painting and Allied Trades No. 36*, 768 F.2d 1115, 1118 n. 1 (9th Cir.1985) (stating a similar principle); *San Diego County Dist. Council of Carpenters v. Cory*, 685 F.2d 1137, 1141 (9th Cir.1982) (stating a similar principle); *FMC Corp.*, 658 F.2d at 1290 (citing approvingly Justice Frankfurter's dissent in *Lincoln Mills*).

Binding precedent thus supports, albeit not strongly, the conclusion that we have reached from interpreting (a) the statutory term "transaction," (b) the scope of Congress' commerce power as understood in 1925, and (c) the legislative history of the FAA.

### E.

█ The interpretation of the FAA has remained confused, however, because many courts (and the dissent here) have focused on the FAA's exclusion provision, § 1, and not its coverage provision, § 2. However, when interpreting a statute, we logically should look first to the coverage provision (regardless of its number).[14]

---

**13.** The Supreme Court also suggested that the FAA does not apply to labor contracts in *United Paperworkers Int'l Union v. Misco*, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). There, the Court analyzed an arbitration provision in a collective bargaining agreement for production and maintenance employees at a paper-converting plant. *Id.* at 31–33, 108 S.Ct. 364. Although the employees did not transport people or goods in interstate commerce, the Court nevertheless relied on the FAA *only by analogy:*

The Arbitration Act does not apply to "contracts of employment of ... workers engaged in foreign or interstate commerce," 9 U.S.C. § 1, but the federal courts

have often looked to the Act for guidance in labor arbitration cases....
*Id.* at 40 n. 9, 108 S.Ct. 364.

**14.** Suppose that Section 2 of an act prohibits all federal felons from possessing a firearm, but Section 1 of the act excludes any person who was convicted of a non-violent felony. If one looks only at the exclusion, one might think that the act prohibits state felons who were convicted of violent felonies from possession a firearm. However, if one looks at the coverage provision, it is apparent that the act does not apply to any state felons. Similarly, here, we cannot interpret the scope of the FAA accurately without beginning with the provision that defines its coverage, § 2.

As noted, the "transaction" requirement suggests that Congress did not intend for § 2 to apply to any employment contracts. At its broadest, however, Congress intended for § 2 to apply only to contracts of workers who transport people or goods in interstate commerce—the full reach of its commerce power in 1925. In § 1, Congress excluded those same workers from the reach of the FAA. Reading § 2 and § 1 together, as we must, demonstrates that Congress did not intend for the FAA to apply to any employment contracts. *See Bernhardt v. Polygraphic Co. of Am.*, 350 U.S. 198, 201, 76 S.Ct. 273, 100 L.Ed. 199 (1956) (holding that courts must read the provision of the FAA together, because "[s]ections 1, 2, and 3 are integral parts of a whole").

Other circuits (and the dissent here) have refused to follow that approach, which is why they have reached the wrong result. In the process, they have provided anachronistic "explanations" in support of their conclusions that the FAA applies to some employment contracts.

One such explanation, cited by Campbell Soup, was provided by the Third Circuit in *Tenney*, which concluded that the Act excluded only those workers for whom there already was special arbitration. 207 F.2d at 452–53. As Professor Finkin has argued, however, "the court reasoned backward and so got it wrong." Finkin, 17 Berkeley J. Emp. & Lab. L. at 291. Congress could not have intended for the FAA to exclude only employees who already had existing arbitration procedures available, because transportation workers had no alternative arbitration system at the time. *Id.* Only seamen and railroad workers had arbitration alternatives and, if Congress wanted to limit the exclusion clause to these groups, it would have done so explicitly. Transportation workers were a large and important part of interstate commerce during the early 1920s and unquestionably a critical subject of Congress' interstate commerce power. Further, the visibility of these enterprises politically was increased by the legal contest over their regulatory status at the time. *See id.*

The exclusion of these workers could not be justified by an alternate arbitration system. That being so, we decline to adopt that anachronistic "explanation."

Campbell Soup also relies on the rule of *ejusdem generis* to interpret narrowly the employment exclusion. The rule of *ejusdem generis* "limits general terms which follow specific ones to matters similar to those specified." *Cole*, 105 F.3d at 1471. Accordingly, the general phrase "any other class of workers engaged in foreign or interstate commerce" in the exclusion clause takes its meaning from the specific terms preceding it—"seamen" and "railroad employees"—and includes only those other classes of workers who, similarly, are working in commerce. *Id.*

This line of reasoning, however, is inapplicable to the FAA. As indicated above, this approach impermissibly focuses solely on § 1, without first taking a step back and looking at section § 2. Moreover, as the dissent in *Tenney* convincingly argues:

> Since the intention of Congress manifestly was to confine the Act to commercial disputes, ejusdem generis has no possible relevancy here. As said in *Gooch v. United States*, 297 U.S. 124, 128, 56 S.Ct. 395 [1936], it [the rule of ejusdem generis] may not be used to defeat the obvious purpose of legislation.

*Tenney*, 207 F.2d at 458 (McLaughlin, J., dissenting) (citations and internal quotation marks omitted). The meaning of § 2, the 1925 scope of Congress' commerce power, and the legislative history of the FAA demonstrate the obvious scope and purpose of the FAA, which *ejusdem generis* cannot be used to defeat.

Campbell Soup also relies on the textual argument from *Cole* and (a similar case from the Sixth Circuit, *Asplundh*) to maintain that the use of the term "engaged in" interstate commerce in § 1 points to a much narrower construction than the use of the term "involving" commerce, found in § 2 of the FAA. *See Cole*, 105 F.3d at 1471–72; *Asplundh*, 71 F.3d at 601. To arrive at this distinction, the court in *Cole*

relied on *Terminix*, 513 U.S. at 273–74, 115 S.Ct. 834, which held that the term "involving" commerce is as broad as the term "affecting" commerce (i.e., the term expresses the full reach of the Commerce Clause). Thus, while the term "involving" interstate commerce, in § 2, dictates the full reach of Congress' commerce power, the phrase "engaged in ... interstate commerce," in § 1, has a narrower meaning, reaching only those workers who are transporting people or goods in interstate commerce. *See Cole*, 105 F.3d at 1471–72.

As Professor Finkin points out, however:

> The difficulty [with this interpretation] is that the distinction has no support in either the law of the period or the history of the Act. On the law, there is no doubt that by the 1940s the Supreme Court had expanded the Commerce power to reach a class of workers who "affected" commerce even though they were not engaged in it; but it is dubious, at the very least, that that distinction was well recognized in 1924.

Finkin, 17 Berkeley J. Emp. & Lab. L. at 294. Emphasizing the same point, others commentators have suggested that Congress used different terms in the two provisions solely because of grammar:

> [I]t is unlikely that the different wording of both sections, "involving commerce" as opposed to "engaged in commerce," arose out of anything other than grammatical necessity.... [I]t would have been incorrect for Congress to have stated that the transaction was "engaged" in commerce or to have referred to "a class of workers involving commerce."

Hellekson, 70 N. Dak. L.Rev. at 445 & n. 89 (citations omitted).

Courts that have made these kinds of textual distinctions have relied entirely on post-New Deal cases to support the difference between "engaged in" and "involving" commerce. *See* Finkin, 17 Berkeley J. Emp. & Lab. L. at 303 n. 55. Because it is apparent that Congress did not intend for the FAA to apply to employment con-

tracts, we decline to adopt that anachronistic "explanation."

We also reject other circuits' reliance on *Terminix*. In *Terminix*, the Supreme Court held that Congress' use of the term "involving commerce" in § 2 indicated its intent for the term to expand as Congress' commerce power expanded. 513 U.S. at 273–75, 115 S.Ct. 834. In reaching that conclusion, the Court held that: (1) the term is the functional equivalent of the phrase "affecting commerce," which defines the current scope of Congress' commerce power; (2) the Act's legislative history suggested an expansive congressional intent; (3) the Court's precedent had described its reach as coinciding with that of the Commerce Clause; and (4) a broader interpretation is consistent with the purpose of the Act. *Id.*

*Terminix* supports our conclusion that the FAA does not apply to employment contracts. As mentioned above: (1) the phrase that Congress used in the employment exclusion of § 1 was, at enactment, the functional equivalent of excluding all employment contracts; (2) the legislative history shows that Congress did not intend for the FAA to apply to any employment contracts; (3) to the extent that precedent has addressed the issue, it has suggested that Congress did not intend for the FAA to apply to employment contracts; and (4) that interpretation is consistent with the original scope of the FAA, which excluded all employment contracts.

Other circuits have erred in applying *Terminix*, because they have ignored the "transaction" requirement in § 2 and, thus, have extended that section to the full reach of Congress' commerce power as understood in the post–1937 world. At the same time, they have refused to extend the § 1 employment exclusion similarly, thereby creating a disharmony between the two provisions, a disharmony that did not exist when Congress enacted the FAA. *See* Epstein, 1 Green Bag 2d at 27–29 (so concluding).

**1094**

III.

■ Based on the wording of § 2, the pre-New Deal scope of Congress' commerce power, the legislative history of the FAA, and the suggestions gleaned from *Lincoln Mills, Misco, Gilmer,* and *Terminix,* we hold that the FAA does not apply to labor or employment contracts. Thus, the FAA is inapplicable to the CBA that governs Craft's employment. Accordingly, we have no jurisdiction over Campbell Soup's interlocutory appeal and this appeal is hereby

DISMISSED.

BRUNETTI, Circuit Judge, Dissenting.

Today, the majority goes against the great weight of circuit court authority[1] by holding that exclusionary clause of § 1 of the Federal Arbitration Act ("FAA") applies to all contracts of employment within the scope of the Commerce Clause and that we therefore lack jurisdiction to hear this interlocutory appeal. Because I find that the plain language of statute dictates a contrary result, I respectfully dissent.

The majority avers that, when sections 1 and 2 of the FAA are read together, the term "engaged in interstate commerce" is ambiguous. To resolve this perceived ambiguity, it examines the historical context and legislative history of the FAA. From these extrinsic sources, the majority determines that Congress clearly intended to exclude all employment contracts from the ambit of the Act and that therefore the traditional rules of statutory interpretation are inapplicable because their use would frustrate obvious Congressional intent. In contrast to the majority's approach to statutory interpretation, I believe that we have an obligation to first analyze the text and structure of the FAA before turning to extrinsic material. Only if these inquiries prove unhelpful in discerning Congressional intent should we engage in the majority's rather complex exercise in statutory interpretation. *See, e.g., Shannon v. Unit-*

*ed States,* 512 U.S. 573, 584, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994); *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *United States v. Taylor,* 487 U.S. 326, 108 S.Ct. 2413, 101 L.Ed.2d 297 (1988) (Scalia, J., concurring in part).

The plain language of the exclusionary clause states that the Act does not "apply to contracts of employment of seamen, railroad employees, or any other class of worker engaged in foreign or interstate commerce." 9 U.S.C. § 1 (1994). A natural reading of this language indicates that Congress intended to exclude three specific types of employment contracts from the scope of the FAA. If one reads, as the majority does, the final phrase-"any other class of workers engaged in foreign or interstate commerce"-to exclude all contracts of employment then the specific pronouncements that seamen and railroad workers' employment contracts do not fall within the purview of the Act are drained of all meaning. *See Rojas v. TK Communications, Inc.,* 87 F.3d 745, 748 (5th Cir. 1996) ("[i]t is quite impossible to apply a broad meaning to the term 'commerce' in Section 1 and not rob the rest of the exclusionary clause of all significance") (internal citations omitted); *Cole v. Burns International Security Services,* 105 F.3d 1465,1470–71 (D.C.Cir.1997).

The "cardinal principle of statutory construction" instructs that a court has a "duty to give effect, if possible, to every clause and word of a statute." *Bennett v. Spear,* 520 U.S. 154, 173, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (internal citations omitted). Here, we can fulfill this duty by concluding that the phrase "workers engaged in interstate commerce" refers only to those workers who are themselves engaged in the movement of goods in interstate commerce. Congress with ease could have drafted § 1 to read "nothing herein shall apply to contracts of employ-

---

**1.** As the majority concedes, almost every circuit to have considered this question directly has held that the employment exclusion

clause of § 1 should be interpreted narrowly. *See* Majority Opinion, at n. 6.

ment." *Cole*, 105 F.3d at 1471. This, however, is not the language Congress enacted into law and I would decline to say that Congress included the words "seamen" and "railroad employees" for no purpose.

As the majority notes, the rule of ejusdem generis also suggests that § 1 should be interpreted narrowly. Application of this principle here indicates that the general reference to "any other class of workers engaged in foreign or interstate commerce" is most reasonably construed to include only workers who, like "seamen" and "railroad employees," are themselves engaged directly in the movement of goods in interstate commerce. *See Asplundh Tree Expert Co. v. Bates,* 71 F.3d 592, 598 (6th Cir.1995) (quoting *Tenney Engineering Inc. v. United Electrical, Radio & Machine Workers of America, Local 437,* 207 F.2d 450, 452 (3d Cir.1953)).

Congress' phraseology in § 2, the primary substantive provision of the FAA, also supports a narrow interpretation of the employment exclusion clause. *See Asplundh Tree,* 71 F.3d at 601; *Allied–Bruce Terminix Companies, Inc. v. Dobson,* 513 U.S. 265, 273, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995); *Cole,* 105 F.3d at 1471–72. Section 2 states that arbitration agreements in contracts "evidencing a transaction *involving commerce* " are enforceable in federal courts. 9 U.S.C. § 2 (1994). Section 1, by contrast, excludes employment contracts of "workers *engaged in . . . interstate commerce.*" The fact that Congress used different phrases to define the scope of the FAA generally on the one hand and the transactions that are excluded from the Act on the other indicates that Congress did not intend these sections to have the same scope. While some commentators and the majority here suggest that the distinction between the phrases "involving commerce" and "engaged in commerce" was not recognized in 1925 when the FAA was enacted, the Supreme Court has indicated that the term "in commerce" when used in statutes of this era should be interpreted narrowly. *See United States v. American Bldg. Maint. Industries,* 422 U.S. 271, 275–79, 95 S.Ct. 2150, 45 L.Ed.2d 177 (1975); *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 195, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974). This textual argument is particularly persuasive here in light of the fact that when Congress reenacted the FAA in 1947 it was settled law that the phrase "engaged in commerce" was not coextensive with the limits of the power of Congress over interstate commerce. *See, e.g., FTC v. Bunte Brothers, Inc.,* 312 U.S. 349, 61 S.Ct. 580, 85 L.Ed. 881 (1941); *Kirschbaum v. Walling,* 316 U.S. 517, 522, 62 S.Ct. 1116, 86 L.Ed. 1638 (1942); *Overstreet v. North Shore Corp.,* 318 U.S. 125, 128–29, 63 S.Ct. 494, 87 L.Ed. 656 (1943).

By utilizing the traditional tools of statutory construction, the plain meaning of the exclusionary clause becomes clear: employment contracts for seamen, railroad workers, and other workers actually involved in the flow of commerce are excluded from the scope of the FAA. "The plain meaning of legislation should be conclusive, except in the rare case in which the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters." *United States v. Ron Pair Enters.,* 489 U.S. 235, 243, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

The majority finds that this is one of the rare cases in which the traditional rules of statutory construction are inapplicable because their use would defeat the "obvious scope and purpose" of the exclusionary clause. The majority, however, does not find the indicia of congressional intent in either the text or structure of the Act. Rather, it divines from the historical context and legislative history that Congress clearly intended that the Act would apply only to commercial disputes and not to labor disputes. I disagree. Even assuming that the scant legislative history can be read to support such an interpretation, I agree with the D.C. Circuit that "[i]n a case such as this, where the statutory text does not admit of serious ambiguity, . . . legislative history is, at best, secondary and at worst irrelevant." *Cole,* 105 F.3d at 1472 (citing *Davis v. Michigan Dep't of*

*Treasury,* 489 U.S. 803, 808–809 n. 3, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989)).

For the foregoing reasons, I would find that, because Craft does not work in interstate commerce, this court has jurisdiction to hear this appeal under the FAA and would decide the case on the merits.